## HOFFA *v.* UNITED STATES.

No. 32.   Argued October 13, 1966.—Decided December 12, 1966.*

---

*Together with No. 33, *Parks* v. *United States*, No. 34, *Campbell* v. *United States*, and No. 35, *King* v. *United States*, also on certiorari to the same court.

294

*Joseph A. Fanelli* argued the cause for petitioners in all cases. With him on the briefs were *Morris A. Shenker, Daniel B. Maher, Jacques M. Schiffer, Cecil D. Branstetter, P. D. Maktos* and *Harold E. Brown.*

*Assistant Attorney General Vinson* and *Nathan Lewin* argued the cause for the United States in all cases. With them on the brief were *Solicitor General Marshall* and *Philip R. Monahan.*

Briefs of *amici curiae,* urging reversal in No. 32, were filed by *Morris Lavine* for the Criminal Courts Bar Association of Los Angeles County, and by *Osmond K. Fraenkel* for the American Civil Liberties Union.

MR. JUSTICE STEWART delivered the opinion of the Court.

Over a period of several weeks in the late autumn of 1962 there took place in a federal court in Nashville, Tennessee, a trial by jury in which James Hoffa was charged with violating a provision of the Taft-Hartley Act. That trial, known in the present record as the Test Fleet trial, ended with a hung jury. The petitioners now before us—James Hoffa, Thomas Parks, Larry Campbell, and Ewing King—were tried and convicted

in 1964 for endeavoring to bribe members of that jury.[1] The convictions were affirmed by the Court of Appeals.[2] A substantial element in the Government's proof that led to the convictions of these four petitioners was contributed by a witness named Edward Partin, who testified to several incriminating statements which he said petitioners Hoffa and King had made in his presence during the course of the Test Fleet trial. Our grant of certiorari was limited to the single issue of whether the Government's use in this case of evidence supplied by Partin operated to invalidate these convictions. 382 U. S. 1024.

The specific question before us, as framed by counsel for the petitioners, is this:

> "Whether evidence obtained by the Government by means of deceptively placing a secret informer in the quarters and councils of a defendant during one criminal trial so violates the defendant's Fourth, Fifth and Sixth Amendment rights that suppression of such evidence is required in a subsequent trial of the same defendant on a different charge."

At the threshold the Government takes issue with the way this question is worded, refusing to concede that it " 'placed' the informer anywhere, much less that it did so 'deceptively.' " In the view we take of the matter, however, a resolution of this verbal controversy is unnecessary to a decision of the constitutional issues before us. The basic facts are clear enough, and a lengthy discussion of the detailed minutiae to which a large portion of the briefs and oral arguments was addressed would serve only to divert attention from the real issues before us.

---

[1] Petitioners Hoffa, Parks, and Campbell were convicted under 18 U. S. C. § 1503 for endeavoring corruptly to influence Test Fleet juror Gratin Fields. Petitioners Hoffa and King were convicted of a similar offense involving Test Fleet juror Mrs. James M. Paschal.

[2] 349 F. 2d 20.

The controlling facts can be briefly stated. The Test Fleet trial, in which James Hoffa was the sole individual defendant, was in progress between October 22 and December 23, 1962, in Nashville, Tennessee. James Hoffa was president of the International Brotherhood of Teamsters. During the course of the trial he occupied a three-room suite in the Andrew Jackson Hotel in Nashville. One of his constant companions throughout the trial was the petitioner King, president of the Nashville local of the Teamsters Union. Edward Partin, a resident of Baton Rouge, Louisiana, and a local Teamsters Union official there, made repeated visits to Nashville during the period of the trial. On these visits he frequented the Hoffa hotel suite, and was continually in the company of Hoffa and his associates, including King, in and around the hotel suite, the hotel lobby, the courthouse, and elsewhere in Nashville. During this period Partin made frequent reports to a federal agent named Sheridan concerning conversations he said Hoffa and King had had with him and with each other, disclosing endeavors to bribe members of the Test Fleet jury. Partin's reports and his subsequent testimony at the petitioners' trial unquestionably contributed, directly or indirectly, to the convictions of all four of the petitioners.[3]

---

[3] Partin testified at the trial of this case that petitioners Hoffa and King had made the following statements during the course of the Test Fleet trial:

On October 22, the day Partin first arrived in Nashville, King told him that a meeting had been "set up on the jury that night." That evening Hoffa told Partin that he wanted Partin to stay in Nashville in order to call on some people. Hoffa explained "that they was going to get to one juror or try to get to a few scattered jurors and take their chances." The next day Partin was told by Hoffa that Hoffa might want him "to pass something for him." As Hoffa said this, he hit his rear pocket with his hand. On October 25, the day after Test Fleet juror James Tippens had reported to the trial judge that he had been approached with a bribe offer,

The chain of circumstances which led Partin to be in Nashville during the Test Fleet trial extended back at least to September of 1962. At that time Partin was in jail in Baton Rouge on a state criminal charge. He was

---

Partin asked Hoffa about his wanting Partin to "pass something." Hoffa replied, "The dirty bastards went in and told the Judge that his neighbor had offered him $10,000," and added, "We are going to have to lay low for a few days." King told Partin on October 26 that he intended to influence a female juror, Mrs. Paschal, in Hoffa's favor, and added that the juror and her husband, a highway patrolman, "loved money, and $10,000.00 [is] a lot of money." Hoffa informed Partin on October 29 that he "would pay 15 or $20,000, whatever—whatever it cost to get to the jury." On November 5, in Partin's presence, Hoffa berated King for failing in his promises to "get the patrolman." King then told Partin that he was arranging a meeting with the highway patrolman, but on November 7 King admitted to Partin that he had not yet contacted the highway patrolman and that Hoffa had been complaining "about not getting to the jury." Hoffa criticized King in the presence of Partin on November 14 for "not making a contact like he told him he would," adding that he "wanted some insurance." Later the same day, King told Partin that he had arranged to meet with the highway patrolman, and that he had prepared a cover story to allay suspicion. On November 15 Hoffa asked King in Partin's presence whether he had "made the contacts." King related to Partin on November 20 a meeting that King had had with juror Paschal's husband, stating that the highway patrolman wanted a promotion rather than money. The same day Hoffa told Partin that he was disturbed because "the Highway Patrolman wouldn't take the money," adding that if he had "taken the money it would have pinned him down and he couldn't have backed up."

There was other evidence at the trial that petitioner Campbell, a union associate of Hoffa's, and petitioner Parks, Campbell's uncle, had made bribe offers to Gratin Fields, a Negro juror. On November 7, according to Partin, Hoffa told Partin that he had "the colored male juror in [his] hip pocket," and that Campbell "took care of it." Hoffa told Partin that Campbell, a Negro, was related to Fields, and that while Fields had refused the bribe he would not "go against his own people." Hoffa concluded, "[I]t looks like our best bet is a hung jury unless we can get to the foreman of the jury. If they have a hung jury, it will be the same as acquittal because they will never try the case again."

also under a federal indictment for embezzling union funds, and other indictments for state offenses were pending against him. Between that time and Partin's initial visit to Nashville on October 22 he was released on bail on the state criminal charge, and proceedings under the federal indictment were postponed. On October 8, Partin telephoned Hoffa in Washington, D. C., to discuss local union matters and Partin's difficulties with the authorities. In the course of this conversation Partin asked if he could see Hoffa to confer about these problems, and Hoffa acquiesced. Partin again called Hoffa on October 18 and arranged to meet him in Nashville. During this period Partin also consulted on several occasions with federal law enforcement agents, who told him that Hoffa might attempt to tamper with the Test Fleet jury, and asked him to be on the lookout in Nashville for such attempts and to report to the federal authorities any evidence of wrongdoing that he discovered. Partin agreed to do so.

After the Test Fleet trial was completed, Partin's wife received four monthly installment payments of $300 from government funds, and the state and federal charges against Partin were either dropped or not actively pursued.

Reviewing these circumstances in detail, the Government insists the fair inference is that Partin went to Nashville on his own initiative to discuss union business and his own problems with Hoffa, that Partin ultimately cooperated closely with federal authorities only after he discovered evidence of jury tampering in the Test Fleet trial, that the payments to Partin's wife were simply in partial reimbursement of Partin's subsequent out-of-pocket expenses, and that the failure to prosecute Partin on the state and federal charges had no necessary connection with his services as an informer. The findings of the trial court support this version of the

facts,[4] and these findings were accepted by the Court of Appeals as "supported by substantial evidence." 349 F. 2d, at 36. But whether or not the Government "placed" Partin with Hoffa in Nashville during the Test Fleet trial, we proceed upon the premise that Partin was a government informer from the time he first arrived in Nashville on October 22, and that the Government compensated him for his services as such. It is upon that premise that we consider the constitutional issues presented.

Before turning to those issues we mention an additional preliminary contention of the Government. The

---

[4] In denying the defense motion to suppress Partin's testimony, the trial court stated: "I would further find that the government did not place this witness Mr. Partin in the defendants' midst or have anything to do with placing him in their midst, rather that he was knowingly and voluntarily placed in their midst by one of the defendants."

The trial court's memorandum denying a motion for a new trial contained the following statement:

"The action of the Court in denying the motions of the defendants to suppress the testimony of the witness Partin is complained of in Grounds 41 and 42 of the motions for new trial. It is contended that one of the findings of fact of the Court with respect to the motion to suppress was rendered incorrect by subsequent evidence in the case. It is contended that the telephone transcriptions of the telephone calls between Partin and Hoffa on October 8 and 18, 1962, established that the defendant Hoffa did not invite Partin to Nashville. The telephone transcriptions reflect that the defendant Hoffa agreed to an appointment to see Partin in Nashville. Even if the defendant Hoffa did not initiate the invitation of Partin to come to Nashville, but rather Partin solicited the invitation, this does not in any way alter the Court's finding that the Government did not place or keep Partin with the defendant Hoffa. . . . The Government requested of Partin only that he report information of jury tampering or other illegal activity of which he became aware. Partin voluntarily furnished such information. He remained in Nashville or returned to Nashville either at the request or with the consent of the defendant Hoffa and not at the instruction of the Government."

petitioner Hoffa was the only individual defendant in the Test Fleet case, and Partin had conversations during the Test Fleet trial only with him and with the petitioner King. So far as appears, Partin never saw either of the other two petitioners during that period. Consequently, the Government argues that, of the four petitioners, only Hoffa has standing to raise a claim that his Sixth Amendment right to counsel in the Test Fleet trial was impaired, and only he and King have standing with respect to the other constitutional claims. Cf. *Wong Sun* v. *United States,* 371 U. S. 471, 487–488, 491–492; *Jones* v. *United States,* 362 U. S. 257, 259–267. It is clear, on the other hand, that Partin's reports to the agent Sheridan uncovered leads that made possible the development of evidence against petitioners Parks and Campbell. But we need not pursue the nuances of these "standing" questions, because it is evident in any event that none of the petitioners can prevail unless the petitioner Hoffa prevails. For that reason, the ensuing discussion is confined to the claims of the petitioner Hoffa (hereinafter petitioner), all of which he clearly has standing to invoke.

## I.

It is contended that only by violating the petitioner's rights under the Fourth Amendment was Partin able to hear the petitioner's incriminating statements in the hotel suite, and that Partin's testimony was therefore inadmissible under the exclusionary rule of *Weeks* v. *United States,* 232 U. S. 383. The argument is that Partin's failure to disclose his role as a government informer vitiated the consent that the petitioner gave to Partin's repeated entries into the suite, and that by listening to the petitioner's statements Partin conducted an illegal "search" for verbal evidence.

The preliminary steps of this argument are on solid ground. A hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office. *United States* v. *Jeffers,* 342 U. S. 48. The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a constitutionally protected area. *Gouled* v. *United States,* 255 U. S. 298. And the protections of the Fourth Amendment are surely not limited to tangibles, but can extend as well to oral statements. *Silverman* v. *United States,* 365 U. S. 505.

Where the argument falls is in its misapprehension of the fundamental nature and scope of Fourth Amendment protection. What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile.[5] There he is protected from unwarranted governmental intrusion. And when he puts something in his filing cabinet, in his desk drawer, or in his pocket, he has the right to know it will be secure from an unreasonable search or an unreasonable seizure. So it was that the Fourth Amendment could not tolerate the warrantless search of the hotel room in *Jeffers,* the purloining of the petitioner's private papers in *Gouled,* or the surreptitious electronic surveillance in *Silverman.* Countless other cases which have come to this Court over the years have involved a myriad of differing factual contexts in which the protections of the Fourth Amendment have been appropriately invoked. No doubt the future will bring countless others. By nothing we say here do we either foresee or foreclose factual

---

[5] We do not deal here with the law of arrest under the Fourth Amendment.

302

situations to which the Fourth Amendment may be applicable.

In the present case, however, it is evident that no interest legitimately protected by the Fourth Amendment is involved. It is obvious that the petitioner was not relying on the security of his hotel suite when he made the incriminating statements to Partin or in Partin's presence. Partin did not enter the suite by force or by stealth. He was not a surreptitious eavesdropper. Partin was in the suite by invitation, and every conversation which he heard was either directed to him or knowingly carried on in his presence. The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing.[6] As counsel for the petitioner himself points out, some of the communications with Partin did not take place in the suite at all, but in the "hall of the hotel," in the "Andrew Jackson Hotel lobby," and "at the courthouse."

Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. Indeed, the Court unanimously rejected that very contention less than four years ago in *Lopez* v. *United States*, 373 U. S. 427. In that case the petitioner had been convicted of attempted bribery of an internal revenue agent named Davis. The Court was divided with regard to the admissibility in evidence of a surreptitious electronic recording of an incriminating conversation Lopez had had in his private office with Davis. But there was no dissent from the view that testimony

---

[6] The applicability of the Fourth Amendment if Partin had been a stranger to the petitioner is a question we do not decide. Cf. *Lewis* v. *United States, ante,* p. 206.

about the conversation by Davis himself was clearly admissible.

As the Court put it, "Davis was not guilty of an unlawful invasion of petitioner's office simply because his apparent willingness to accept a bribe was not real. Compare *Wong Sun* v. *United States,* 371 U. S. 471. He was in the office with petitioner's consent, and while there he did not violate the privacy of the office by seizing something surreptitiously without petitioner's knowledge. Compare *Gouled* v. *United States, supra.* The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished. . . ." 373 U. S., at 438. In the words of the dissenting opinion in *Lopez,* "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.,* at 465. See also *Lewis* v. *United States, ante,* p. 206.

Adhering to these views, we hold that no right protected by the Fourth Amendment was violated in the present case.

## II.

The petitioner argues that his right under the Fifth Amendment not to "be compelled in any criminal case to be a witness against himself" was violated by the admission of Partin's testimony. The claim is without merit.

There have been sharply differing views within the Court as to the ultimate reach of the Fifth Amendment right against compulsory self-incrimination. Some of those differences were aired last Term in *Miranda* v. *Arizona,* 384 U. S. 436, 499, 504, 526. But since at least as long ago as 1807, when Chief Justice Marshall first

gave attention to the matter in the trial of Aaron Burr,[7] all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion. Thus, in the *Miranda* case, dealing with the Fifth Amendment's impact upon police interrogation of persons in custody, the Court predicated its decision upon the conclusion "that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. . . ." 384 U. S., at 467.

In the present case no claim has been or could be made that the petitioner's incriminating statements were the product of any sort of coercion, legal or factual. The petitioner's conversations with Partin and in Partin's presence were wholly voluntary. For that reason, if for no other, it is clear that no right protected by the Fifth Amendment privilege against compulsory self-incrimination was violated in this case.

### III.

The petitioner makes two separate claims under the Sixth Amendment, and we give them separate consideration.

### A.

During the course of the Test Fleet trial the petitioner's lawyers used his suite as a place to confer with him and with each other, to interview witnesses, and to plan the following day's trial strategy. Therefore,

---

[7] "Many links frequently compose that chain of testimony which is necessary to convict any individual of a crime. It appears to the court to be the true sense of the rule that no witness is *compellable* to furnish any one of them against himself. . . ." *In re Willie,* 25 Fed. Cas. 38, 40 (No. 14,692e) (C. C. D. Va. 1807). (Emphasis supplied.)

argues the petitioner, Partin's presence in and around the suite violated the petitioner's Sixth Amendment right to counsel, because an essential ingredient thereof is the right of a defendant and his counsel to prepare for trial without intrusion upon their confidential relationship by an agent of the Government, the defendant's trial adversary. Since Partin's presence in the suite thus violated the Sixth Amendment, the argument continues, any evidence acquired by reason of his presence there was constitutionally tainted and therefore inadmissible against the petitioner in this case. We reject this argument.

In the first place, it is far from clear to what extent Partin was present at conversations or conferences of the petitioner's counsel. Several of the petitioner's Test Fleet lawyers testified at the hearing on the motion to suppress Partin's testimony in the present case. Most of them said that Partin had heard or had been in a position to hear at least some of the lawyers' discussions during the Test Fleet trial. On the other hand, Partin himself testified that the lawyers "would move you out" when they wanted to discuss the case, and denied that he made any effort to "get into or be present at any conversations between lawyers or anything of that sort," other than engaging in such banalities as "how things looked," or "how does it look?" He said he might have heard some of the lawyers' conversations, but he didn't know what they were talking about, "because I wasn't interested in what they had to say about the case." He testified that he did not report any of the lawyers' conversations to Sheridan, because the latter "wasn't interested in what the attorneys said." Partin's testimony was largely confirmed by Sheridan. Sheridan did testify, however, to one occasion when Partin told him about a group of prospective character witnesses being interviewed in the suite by one of the petitioner's lawyers, who "was going

over" some written "questions and answers" with them. This information was evidently relayed by Sheridan to the chief government attorney at the Test Fleet trial.[8]

The District Court in the present case apparently credited Partin's testimony, finding "there has been no interference by the government with any attorney-client relationship of any defendant in this case." The Court of Appeals accepted this finding. 349 F. 2d, at 36. In view of Sheridan's testimony about Partin's report of the interviews with the prospective character witnesses, however, we proceed here on the hypothesis that Partin did observe and report to Sheridan at least some of the activities of defense counsel in the Test Fleet trial.

The proposition that a surreptitious invasion by a government agent into the legal camp of the defense may violate the protection of the Sixth Amendment has found expression in two cases decided by the Court of Appeals for the District of Columbia Circuit, *Caldwell* v. *United States,* 92 U. S. App. D. C. 355, 205 F. 2d 879, and *Coplon* v. *United States,* 89 U. S. App. D. C. 103, 191 F. 2d 749. Both of those cases dealt with government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel. In *Coplon,* the

---

[8] Petitioner maintains that the cross-examination of one of these character witnesses at the Test Fleet trial shows that the prosecution availed itself of the information transmitted by Partin. The following exchange between the prosecutor and witness occurred:

Q. "Did [defense counsel] give you anything to read, Mr. Sammut?"

A. "No, sir, not even a newspaper."

Q. "Not even a newspaper? I am not talking about newspapers, I am talking with respect to your testimony. Did they give you anything to read with respect to your testimony?"

A. "After I talked to them."

Q. "They gave you written questions and answers, didn't they?"

A. "The questions that they asked me and the questions that I answered."

defendant alleged that government agents deliberately intercepted telephone consultations between the defendant and her lawyer before and during trial. In *Caldwell,* the agent, "[i]n his dual capacity as defense assistant and Government agent . . . gained free access to the planning of the defense. . . . Neither his dealings with the defense nor his reports to the prosecution were limited to the proposed unlawful acts of the defense: they covered many matters connected with the impending trial." 92 U. S. App. D. C., at 356, 205 F. 2d, at 880.

We may assume that the *Coplon* and *Caldwell* cases were rightly decided, and further assume, without deciding, that the Government's activities during the Test Fleet trial were sufficiently similar to what went on in *Coplon* and *Caldwell* to invoke the rule of those decisions. Consequently, if the Test Fleet trial had resulted in a conviction instead of a hung jury, the conviction would presumptively have been set aside as constitutionally defective. Cf. *Black* v. *United States, ante,* p. 26.

But a holding that it follows from this presumption that the petitioner's conviction in the present case should be set aside would be both unprecedented and irrational. In *Coplon* and in *Caldwell,* the Court of Appeals held that the Government's intrusion upon the defendant's relationship with his lawyer "invalidates the trial at which it occurred." 89 U. S. App. D. C., at 114, 191 F. 2d, at 759; 92 U. S. App. D. C., at 357, 205 F. 2d, at 881. In both of those cases the court directed a new trial,[9] and the second trial in *Caldwell* resulted in a conviction which this Court declined to review. 95 U. S. App. D. C. 35, 218 F. 2d 370, 349 U. S. 930. The argument here, therefore, goes far beyond anything decided in *Caldwell* or in *Coplon.* For if the petitioner's argument were accepted,

---

[9] In *Coplon,* the grant of a new trial was conditioned on the defendant's proof of her wiretapping allegations.

not only could there have been no new conviction on the existing charges in *Caldwell*, but not even a conviction on other and different charges against the same defendant.

It is possible to imagine a case in which the prosecution might so pervasively insinuate itself into the councils of the defense as to make a new trial on the same charges impermissible under the Sixth Amendment.[10] But even if it were further arguable that a situation could be hypothesized in which the Government's previous activities in undermining a defendant's Sixth Amendment rights at one trial would make evidence obtained thereby inadmissible in a different trial on other charges, the case now before us does not remotely approach such a situation.

This is so because of the clinching basic fact in the present case that none of the petitioner's incriminating statements which Partin heard were made in the presence of counsel, in the hearing of counsel, or in connection in any way with the legitimate defense of the Test Fleet prosecution. The petitioner's statements related to the commission of a quite separate offense—attempted bribery of jurors—and the statements were made to Partin out of the presence of any lawyers.

Even assuming, therefore, as we have, that there might have been a Sixth Amendment violation which might have made invalid a conviction, if there had been one, in the Test Fleet case, the evidence supplied by Partin in the present case was in no sense the "fruit" of any such violation. In *Wong Sun* v. *United States,* 371 U. S. 471, a case involving exclusion of evidence under

---

[10] In the *Caldwell* case, the Court of Appeals implicitly recognized the possibility of a case arising in which a showing could be made of "prejudice to the defense of such a nature as would necessarily render a subsequent trial unfair to the accused." 92 U. S. App. D. C. 355, 357, n. 11, 205 F. 2d 879, 881–882, n. 11.

the Fourth Amendment, the Court stated that "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 371 U. S., at 488.

Even upon the premise that this same strict standard of excludability should apply under the Sixth Amendment—a question we need not decide—it is clear that Partin's evidence in this case was not the consequence of any "exploitation" of a Sixth Amendment violation. The petitioner's incriminating statements to which Partin testified in this case were totally unrelated in both time and subject matter to any assumed intrusion by Partin into the conferences of the petitioner's counsel in the Test Fleet trial. These incriminating statements, all of them made out of the presence or hearing of any of the petitioner's counsel, embodied the very antithesis of any legitimate defense in the Test Fleet trial.

### B.

The petitioner's second argument under the Sixth Amendment needs no extended discussion. That argument goes as follows: Not later than October 25, 1962, the Government had sufficient ground for taking the petitioner into custody and charging him with endeavors to tamper with the Test Fleet jury. Had the Government done so, it could not have continued to question the petitioner without observance of his Sixth Amendment right to counsel. *Massiah* v. *United States,* 377 U. S. 201; *Escobedo* v. *Illinois,* 378 U. S. 478. Therefore, the argument concludes, evidence of statements

made by the petitioner subsequent to October 25 was inadmissible, because the Government acquired that evidence only by flouting the petitioner's Sixth Amendment right to counsel.

Nothing in *Massiah,* in *Escobedo,* or in any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested.[11] The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

## IV.

Finally, the petitioner claims that even if there was no violation—"as separately measured by each such Amendment"—of the Fourth Amendment, the compulsory self-incrimination clause of the Fifth Amendment, or of the Sixth Amendment in this case, the judgment of conviction must nonetheless be reversed. The argument is based upon the Due Process Clause of the Fifth Amendment. The "totality" of the Government's conduct during the Test Fleet trial operated, it is said, to " 'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples

---

[11] We put to one side the extraordinary problems that would have arisen if the petitioner had been arrested and charged during the progress of the Test Fleet trial.

even toward those charged with the most heinous offenses' (*Rochin* v. *California,* 342 U. S. 165, 169)."

The argument boils down to a general attack upon the use of a government informer as "a shabby thing in any case," and to the claim that in the circumstances of this particular case the risk that Partin's testimony might be perjurious was very high. Insofar as the general attack upon the use of informers is based upon historic "notions" of "English-speaking peoples," it is without historical foundation. In the words of Judge Learned Hand, "Courts have countenanced the use of informers from time immemorial; in cases of conspiracy, or in other cases when the crime consists of preparing for another crime, it is usually necessary to rely upon them or upon accomplices because the criminals will almost certainly proceed covertly. . . ." *United States* v. *Dennis,* 183 F. 2d 201, at 224.

This is not to say that a secret government informer is to the slightest degree more free from all relevant constitutional restrictions than is any other government agent. See *Massiah* v. *United States,* 377 U. S. 201. It *is* to say that the use of secret informers is not *per se* unconstitutional.

The petitioner is quite correct in the contention that Partin, perhaps even more than most informers, may have had motives to lie. But it does not follow that his testimony was untrue, nor does it follow that his testimony was constitutionally inadmissible. The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury. At the trial of this case, Partin was subjected to rigorous cross-examination, and the extent and nature of his dealings with federal and state authorities were insistently ex-

312

plored.[12]   The trial judge instructed the jury, both specifically[13] and generally,[14] with regard to assessing Partin's credibility.   The Constitution does not require us to upset the jury's verdict.

*Affirmed.*

MR. JUSTICE WHITE and MR. JUSTICE FORTAS took no part in the consideration or decision of these cases.

[For opinion of MR. JUSTICE DOUGLAS, see *post,* p. 340.]

---

[12] Partin underwent cross-examination for an entire week.   The defense was afforded wide latitude to probe Partin's background, character, and ties to the authorities; it was permitted to explore matters that are normally excludable, for example, whether Partin had been charged with a crime in 1942, even though that charge had never been prosecuted.

[13] The judge instructed the jury that it was petitioner's contention that he "did not invite Edward Partin to come to Nashville, Tennessee, during the trial of [the Test Fleet case]' but that the said Edward Partin came of his own accord under the pretense of attempting to convince Mr. Hoffa that the Teamsters local union in Baton Rouge, Louisiana should not be placed in trusteeship by reason of Partin's being under indictment and other misconduct on Partin's part, but for the real purpose of fabricating evidence against Hoffa in order to serve his own purposes and interests."

[14] The jury was instructed: "You should carefully scrutinize the testimony given and the circumstances under which each witness has testified, and every matter in evidence which tends to indicate whether the witness is worthy of belief.   Consider each witness' intelligence, his motives, state of mind, his demeanor and manner while on the witness stand.   Consider also any relation each witness may bear to either side of the case . . . .   All evidence of a witness whose self-interest is shown from either benefits received, detriments suffered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care."

Mr. Chief Justice Warren, dissenting.

I cannot agree either with the opinion of the Court affirming these convictions or with the separate opinions of Mr. Justice Clark and Mr. Justice Douglas to the effect that the writs of certiorari were improvidently granted.

I.

As to the latter, it seems to me that the finding of the District Court which so troubles my Brothers Clark and Douglas is in fact no roadblock to our review of the important questions presented by the petitions. It has long been settled that this Court will not be bound by the findings of lower courts when it is alleged that fundamental constitutional rights have been violated. *Jacobellis* v. *Ohio,* 378 U. S. 184 (1964); *Haynes* v. *Washington,* 373 U. S. 503 (1963); *Watts* v. *Indiana,* 338 U. S. 49 (1949); *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652 (1945); *Norris* v. *Alabama,* 294 U. S. 587 (1935). We have said, "The duty of this Court to make its own independent examination of the record when federal constitutional deprivations are alleged is clear, resting, as it does, on our solemn responsibility for maintaining the Constitution inviolate." *Napue* v. *Illinois,* 360 U. S. 264, 271 (1959).

The finding in question here is not one which the District Judge arrived at by resolving contradictory testimony on the basis of credibility. Findings of fact based on crediting the testimony of some witnesses and discrediting the testimony of others may properly be accorded some insulation from appellate review because of the superior opportunity of the trial judge to observe the demeanor of the witnesses. In this case, however, the testimony concerning the circumstances surrounding Partin's entry into Hoffa's councils was not sub-

stantially in dispute. While those circumstances are set forth in greater detail *infra*, a brief summary discloses that Partin, after discussing Hoffa with federal agents and learning of their intense and mutually beneficial interest, successfully solicited an invitation to meet with Hoffa. Partin's release from jail was assisted by the federal agents, and he was compensated in a financial sense as well; in return, he kept the federal agents fully informed of all that occurred from the outset of his contact with Hoffa.

Surely the only reasonable construction of these facts is that Partin was acting as a paid federal informer when he traveled to Nashville and attached himself to Hoffa. And the fact that Hoffa on Partin's urging agreed to a meeting in Nashville is not inconsistent with this conclusion. An invasion of basic rights made possible by prevailing upon friendship with the victim is no less proscribed than an invasion accomplished by force. See *Massiah* v. *United States,* 377 U. S. 201 (1964); *Gouled* v. *United States,* 255 U. S. 298 (1921).

Moreover, at the time we granted the petitions for certiorari in these cases, we knew exactly what we know now. The findings of the District Court were in the record then before us, and no new facts to change the situation have since come to light. In short, there is nothing which should prevent us from facing up to the important questions presented and determining whether the convictions can stand either in light of the Constitution or under our power of supervision over the administration of justice in federal courts.

## II.

For me, this case and two others decided today (*Lewis* v. *United States, ante,* p. 206, and *Osborn* v. *United States, post,* p. 323) present for comparison different facets of the Government's use of informers and under-

cover agents. In two cases of the set I have voted to sustain the activity of the Government. But in this case I find it impossible to do so because the nature of the official practices evidenced here is offensive to the fair administration of justice in federal courts.

At this late date in the annals of law enforcement, it seems to me that we cannot say either that every use of informers and undercover agents is proper or, on the other hand, that no uses are. There are some situations where the law could not adequately be enforced without the employment of some guile or misrepresentation of identity. A law enforcement officer performing his official duties cannot be required always to be in uniform or to wear his badge of authority on the lapel of his civilian clothing. Nor need he be required in all situations to proclaim himself an arm of the law. It blinks the realities of sophisticated, modern-day criminal activity and legitimate law enforcement practices to argue the contrary. However, one of the important duties of this Court is to give careful scrutiny to practices of government agents when they are challenged in cases before us, in order to insure that the protections of the Constitution are respected and to maintain the integrity of federal law enforcement.

I find these three cases which we decide today quite distinguishable from each other in this regard. Although all three involve what may be termed official deception in order to gather evidence for criminal prosecutions, the police practices reviewed are essentially different. The simplest of the three for me is *Lewis*, wherein a federal narcotics agent, having reason to believe that Lewis was a trafficker in narcotics, called him on the telephone using an assumed name and told him that a mutual friend had said Lewis sold narcotics. Lewis affirmed the nature of his occupation and invited the agent to his place of business which, as an incidental matter, turned out also

to be his home. The agent went there, purchased narcotics and arranged for future dealings to occur at the same place but on a reduced-price basis. Later, a second purchase of narcotics was executed by the agent in the same manner.

In *Lewis,* then, there was no intrusion upon the privacy of the household. Nothing was heard, seen, or taken by the agent that was not a necessary part of the business transactions between him and Lewis. The purpose of the agent's visits was to buy narcotics from Lewis, and the details of their business dealings were all that concerned him. *Lewis* simply is not a case where an undercover agent invaded a place used both as a business location and a home and then, overtly or covertly, either seized something or observed or heard something unrelated to the business purpose of his visit. As we said in affirming Lewis' conviction, the principles elaborated in *Gouled* v. *United States,* 255 U. S. 298 (1921), would protect against such overreaching. We do not endorse unconscionable activities or the use of an unreliable informer when we sustain the undercover work of the agent responsible for Lewis' conviction. Compare *Sherman* v. *United States,* 356 U. S. 369 (1958).

In the *Osborn* case, the petitioner employed Robert Vick, a police officer of Nashville, Tennessee, to investigate persons who were members of a panel from which a federal criminal jury was to be selected in a prior trial of James Hoffa in that city. Although he knew Vick's loyalty was due the police department, when he learned that Vick had a cousin on the panel he urged Vick to offer the cousin $10,000 in return for the latter's promise to vote for acquittal if selected to sit on the petit jury. Vick informed federal authorities of this proposal, and made an affidavit to that effect for the judge who was to preside at the Hoffa trial. The judge, in order to determine the truthfulness of the affidavit and to protect

the integrity of the trial, authorized the equipping of Vick with a recording device to be used in further conversations with petitioner. I see nothing wrong with the Government's thus verifying the truthfulness of the informer and protecting his credibility in this fashion.[1] *Lopez* v. *United States,* 373 U. S. 427 (1963). This decision in no sense supports a conclusion that unbridled use of electronic recording equipment is to be permitted in searching out crime. And it does not lend judicial sanction to wiretapping, electronic "bugging" or any of the other questionable spying practices that are used to invade privacy and that appear to be increasingly prevalent in our country today. Cf. *Silverman* v. *United States,* 365 U. S. 505 (1961); *Black* v. *United States, ante,* p. 26; *United States* v. *Schipani,* 362 F. 2d 825, cert. denied, *post,* p. 934, rehearing granted, judgment vacated, and case remanded on suggestion of Solicitor General, *post,* p. 372.

But I consider both *Lewis* and *Osborn* to be materially, even fundamentally, different from this *Hoffa* case. Here, Edward Partin, a jailbird languishing in a Louisiana jail under indictments for such state and federal crimes as embezzlement, kidnapping, and manslaughter (and soon to be charged with perjury and assault), contacted federal authorities and told them he was willing to become, and would be useful as, an informer against Hoffa who was then about to be tried in the Test Fleet case. A motive for his doing this is immediately apparent—namely, his strong desire to work his way out of jail and out of his various legal entanglements with the

---

[1] The recording was not used here as a means to avoid calling the informer to testify. As I noted in my opinion concurring in the result in *Lopez* (373 U. S., at 441), I would not sanction the use of a secretly made recording other than for the purposes of corroborating the testimony of a witness who can give firsthand testimony concerning the recorded conversations and who is made available for cross-examination.

318

State and Federal Governments.[2]   And it is interesting to note that, if this was his motive, he has been uniquely successful in satisfying it.   In the four years since he first volunteered to be an informer against Hoffa he has not been prosecuted on any of the serious federal charges for which he was at that time jailed, and the state charges have apparently vanished into thin air.

Shortly after Partin made contact with the federal authorities and told them of his position in the Baton

[2] One Sydney Simpson, who was Partin's cellmate at the time the latter first contacted federal agents to discuss Hoffa, has testified by affidavit as follows:

"Sometime in September, 1962, I was transferred from the Donaldsonville Parish Jail to the Baton Rouge Parish Jail.   I was placed in a cell with Partin.   For the first few days, Partin acted sort of brave.   Then when it was clear that he was not going to get out in a hurry, he became more excited and nervous.   After I had been in the same cell with Partin for about three days, Partin said, 'I know a way to get out of here.   They want Hoffa more than they want me.'   Partin told me that he was going to get one of the deputies to get Bill Daniels.   Bill Daniels is an officer in the State of Louisiana.   Partin said he wanted to talk to Daniels about Hoffa.   Partin said that he was going to talk to Captain Edwards and ask him to get Daniels.   A deputy, whose name is not known to me, came and took Partin from the cell.   Partin remained away for several hours.

"A few days later Partin was released from the jail.   From the day when I first saw the deputy, until the date when Partin was released, Partin was out of the cell most of the day and sometimes part of the night.   On one occasion Partin returned to the cell and said, 'It will take a few more days and we will have things straightened out, but don't worry.'   Partin was taken in and out of the cell frequently each day.   Partin told me during this time that he was working with Daniels and the FBI to frame Hoffa.   On one occasion I asked Partin if he knew enough about Hoffa to be of any help to Daniels and the FBI, and Partin said, 'It doesn't make any difference.   If I don't know it, I can fix it up.'

"While we were in the cell, I asked Partin why he was doing this to Hoffa.   Partin replied: 'What difference does it make?   I'm thinking about myself.   Aren't you thinking about yourself?   I don't give a damn about Hoffa. . . .'"   R. 171–172.

Rouge Local of the Teamsters Union and of his acquaintance with Hoffa, his bail was suddenly reduced from $50,000 to $5,000 and he was released from jail. He immediately telephoned Hoffa, who was then in New Jersey, and, by collaborating with a state law enforcement official, surreptitiously made a tape recording of the conversation. A copy of the recording was furnished to federal authorities. Again on a pretext of wanting to talk with Hoffa regarding Partin's legal difficulties, Partin telephoned Hoffa a few weeks later and succeeded in making a date to meet in Nashville where Hoffa and his attorneys were then preparing for the Test Fleet trial. Unknown to Hoffa, this call was also recorded and again federal authorities were informed as to the details.

Upon his arrival in Nashville, Partin manifested his "friendship" and made himself useful to Hoffa, thereby worming his way into Hoffa's hotel suite and becoming part and parcel of Hoffa's entourage. As the "faithful" servant and factotum of the defense camp which he became, he was in a position to overhear conversations not directed to him, many of which were between attorneys and either their client or prospective defense witnesses. Pursuant to the general instructions he received from federal authorities to report "any attempts at witness intimidation or tampering with the jury," "anything illegal," or even "anything of interest," Partin became the equivalent of a bugging device which moved with Hoffa wherever he went. Everything Partin saw or heard was reported to federal authorities and much of it was ultimately the subject matter of his testimony in this case. For his services he was well paid by the Government, both through devious and secret support payments to his wife and, it may be inferred, by executed promises not to pursue the indictments under which he was charged at the time he became an informer.

This type of informer and the uses to which he was put in this case evidence a serious potential for undermining the integrity of the truth-finding process in the federal courts. Given the incentives and background of Partin, no conviction should be allowed to stand when based heavily on his testimony. And that is exactly the quicksand upon which these convictions rest, because without Partin, who was the principal government witness, there would probably have been no convictions here. Thus, although petitioners make their main arguments on constitutional grounds and raise serious Fourth and Sixth Amendment questions, it should not even be necessary for the Court to reach those questions. For the affront to the quality and fairness of federal law enforcement which this case presents is sufficient to require an exercise of our supervisory powers. As we said in ordering a new trial in *Mesarosh* v. *United States,* 352 U. S. 1, 14 (1956), a federal case involving the testimony of an unsavory informer who, the Government admitted, had committed perjury in other cases:

> "This is a federal criminal case, and this Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity.
>
> .        .        .        .        .
>
> "The government of a strong and free nation does not need convictions based upon such testimony. It cannot afford to abide with them."

See also *McNabb* v. *United States,* 318 U. S. 332, 341 (1943).

I do not say that the Government may never use as a witness a person of dubious or even bad character. In performing its duty to prosecute crime the Government must take the witnesses as it finds them. They may

be persons of good, bad, or doubtful credibility, but their testimony may be the only way to establish the facts, leaving it to the jury to determine their credibility. In this case, however, we have a totally different situation. Here the Government reaches into the jailhouse to employ a man who was himself facing indictments far more serious (and later including one for perjury) than the one confronting the man against whom he offered to inform. It employed him not for the purpose of testifying to something that had already happened, but rather for the purpose of infiltration to see if crimes would in the future be committed. The Government in its zeal even assisted him in gaining a position from which he could be a witness to the confidential relationship of attorney and client engaged in the preparation of a criminal defense. And, for the dubious evidence thus obtained, the Government paid an enormous price. Certainly if a criminal defendant insinuated his informer into the prosecution's camp in this manner he would be guilty of obstructing justice. I cannot agree that what happened in this case is in keeping with the standards of justice in our federal system and I must, therefore, dissent.

Mr. Justice Clark, joined by Mr. Justice Douglas.

I would dismiss the writs of certiorari as improvidently granted.

The writs of certiorari granted by the Court in these cases are limited to the following question:

> "Whether evidence obtained by the Government by means of deceptively placing a secret informer in the quarters and councils of a defendant during one criminal trial so violates the defendant's Fourth, Fifth and Sixth Amendment rights that suppression of such evidence is required in a subsequent trial of the same defendant on a different charge."

My examination of the record reveals that at the hearing on petitioners' motion to suppress the evidence obtained by the informer, Partin, the District Judge found that "the government did not place this witness Mr. Partin in the defendants' midst . . . rather that he was knowingly and voluntarily placed in their midst by one of the defendants [Hoffa]." This specific finding was approved by the Court of Appeals as being "supported by substantial evidence and . . . not clearly erroneous." 349 F. 2d, at 36. No attack is made here on the findings.

It has long been the rule of this Court that it "cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." *Graver Mfg. Co.* v. *Linde Co.,* 336 U. S. 271, 275 (1949). My careful examination of the record shows that there is a choice here between two permissible views as to the weight of the evidence. The District Judge found the weight of the evidence to be with the Government and the Court of Appeals has approved his finding. I cannot say on this record that it is clearly erroneous.* *United States* v. *Yellow Cab Co.,* 338 U. S. 338, 342 (1949).

In the light of this finding, by which we are bound, there is no issue before us for decision since no evidence was "obtained by the Government by means of deceptively placing a secret informer in the quarters and councils of" petitioner Hoffa.

I would therefore dismiss the writs as improvidently granted.

---

*At one point the informer, Partin, testified: "Mr. Hoffa is the one told me he wanted me to stick around." Petitioners' own witnesses testified that Partin was in the suite "virtually every day" as well as the "nightly meetings," had "ready access" to the files and offices and acted as "sergeant-at-arms" just outside the door of the suite. Hoffa did not testify at the hearing on the motion to suppress.