[No. 1949-2.    Division Two.    February 16, 1977.]

THE STATE OF WASHINGTON, *Respondent*, v. RONALD SABBOT, *Appellant.*

PETRIE, C.J., concurs in the result only.

*Charles Welsh,* for appellant (appointed counsel for appeal).

*Guy Glenn, Prosecuting Attorney,* for respondent.

HALE, J.*—It is bad business to sell contraband drugs,

---

*Judge Frank Hale is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

and a foolish one as well, to make delivery inside one's dwelling house. The point at issue, however, is not whether the buyer who took delivery in the seller's house was a business invitee, licensee, social guest, or trespasser. Rather, it is whether the illegal delivery of drugs to a police agent who followed the seller into his house without either an invitation or a refusal of admittance made an unlawful seizure when the drugs were handed him.

Defendant Ronald Sabbot lived in Raymond, Pacific County. He had a friend named Ralph Strumski. On November 18, 1974, Strumski called Sabbot and asked to come to the latter's house; Sabbot agreed, but told him to come alone. Strumski arrived by automobile with two investigators for the Washington State Patrol, assigned to the investigation of illegal narcotic activities. Neither Sabbot nor Strumski knew who they were nor of their connection with police authorities.

The three men drove up to Sabbot's house and parked their car in his driveway. One of the investigators handed Strumski $500 for the purchase of drugs and Strumski, taking the money, went into Sabbot's house alone. Sabbot and Strumski talked for several minutes inside the house and then both walked outside. While Strumski and Sabbot were in the house, the two police investigators waited outside, one in the car and the other in close proximity. When Sabbot and Strumski emerged from the house the police investigator outside the car met them in the middle of the yard where Strumski handed him $20 in change from the $500 earlier given him. After pocketing the $20, the investigator asked Strumski where the speed (amphetamine) was that he had purchased and Strumski said he had forgotten it and that it was still in the house.

At that point, Sabbot said, "Wait a minute" to all those present, turned around and started across the yard to go into the house. The police investigator followed him. The two entered the house, walked through the living room and at a point near the entry to the kitchen, Sabbot picked up a brown paper bag and handed it to the investigator. The bag

was found to contain four little sacks, each proving to hold a quantity of speed or amphetamines. After Sabbot handed the brown paper bag to the investigator, the two stayed in the living room for about 15 minutes where they discussed a possible sale from Sabbot of 15 pounds of marijuana. Sabbot said that it would take 3 days for delivery of the marijuana and eventually he walked outside and into the yard with the police investigator where he was placed under arrest.

In brief, Strumski was given $500 by two police agents for the purchase of four jars of speed, or amphetamines, from Ronald Sabbot at $120 a jar. He went into the house alone and came out with Sabbot and $20 in change and said he had left the speed inside. Sabbot said to wait a moment and turned to go into his house, saying nothing more, and a police investigator, likewise remaining silent, followed him into the house and through the living room. Near the kitchen the defendant picked up and handed the police agent a brown paper bag containing four sacks of amphetamines. After that they had a 15-minute conversation in the living room concerning a prospective sale of 15 pounds of marijuana by Sabbot.

Charged by information in the Superior Court for Pacific County in count 1 with possession of a controlled substance and count 2 with its delivery (RCW 69.50.401), Sabbot moved to suppress the evidence on the grounds of illegal search and seizure. Found guilty of both counts by a jury, he urges denial of his motion to suppress the evidence as the sole basis for this appeal.

The purpose of a trial is to find the truth, and the verdict of a jury represents the truth as the jury finds it from the evidence or lack of it. To that end all evidence having reasonable connection with the issues as well as all evidence tending to establish or disestablish a material fact in a case should be admitted for a jury's consideration. And the courts must be most circumspect and motivated by the most compelling of reasons before depriving a jury of material and relevant evidence having a bearing on the truth.

Rules of evidence, whether arising from language of the constitution, the common law, statute law, or constitutional theory, ought not to operate to conceal or suppress the truth.

Here the ultimate truth to be found was whether the accused on a certain day, knowingly and intentionally possessed certain amphetamines, and on a certain day knowingly and intentionally delivered them to another. In trying to establish these facts the prosecution managed to get a police agent inside the accused's house. Was his presence there so tainted with illegality as to warrant the court in suppressing the most cogent evidence in the case from which the jury could reach the truth? Without going into the ramifications of the possibly enlarged authority of the police agents stemming from a crime being committed in their presence, we will consider the case as it was largely presented to the trial court—a case of claimed unlawful search and seizure under the Fourth Amendment.

Cases on unlawful search and seizure must be taken in context with the statute law which—except in emergencies to protect life and property—prohibits police officers from entering and searching a private residence without a search warrant under RCW 10.79.040; and makes it a misdemeanor for them to do so under RCW 10.79.045. When defendant Sabbot, while in his yard and engaged in a conversation concerning the sale of amphetamines, told his listeners no more than to wait a minute—and then turned to walk toward and into his house, he was not standing upon his constitutional right to refuse entry. And when the police investigator, without further comment one way or another from the accused, followed him across the yard, into the house and through the living room in such a way that the defendant could not help but know he was being accompanied there, these actions provided persuasive evidence from which the trial court could conclude that the intended purchaser of the amphetamines had not been refused entry to defendant's house.

Of particular significance, in any case involving the taking of evidence in a dwelling house without a warrant, is

the language of the constitutions which on the one hand provides that one's home shall not be invaded without authority of law, article 1, section 7 of the state constitution, and on the other that one shall be secure in his house against *unreasonable* searches and seizures under the fourth amendment to the United States Constitution.

The Constitution of the United States forbids not all, but unreasonable searches and seizures. And whether the search and seizure is unreasonable depends on the circumstances. Law officers, for example, without a warrant, have a right as incident to a lawful arrest, to search the person arrested and the area where the arrest is made. *State v. Jackovick*, 56 Wn.2d 915, 355 P.2d 976 (1960). And where an arrest was made without a warrant, but upon probable cause, a search of the defendant's automobile in the vicinity of the arrest has been held incidental to a lawful arrest and therefore valid. *State v. Hoffman*, 64 Wn.2d 445, 449, 392 P.2d 237 (1964), citing *State v. Jackovick, supra.* Evidence of other crimes found incident to a lawful arrest may be used in prosecution for crimes other than the one for which the arrest was made. *State v. Green*, 43 Wn.2d 102, 260 P.2d 343 (1953). Similarly, in *State v. Dearinger*, 73 Wn.2d 563, 439 P.2d 971 (1968), articles found in an adjoining neighbor's yard, where the officers' physical senses told them they had probably been thrown as they were searching the defendant's house under authority of a search warrant, were held to be taken in a lawful seizure under the search warrant even though the warrant did not describe the adjoining yard nor mention its occupants.

It is thus seen to be the policy of the law where a police officer is lawfully on the premises, either pursuant to a search warrant or otherwise, or is effecting a warrantless arrest upon probable cause, he is not only authorized but encouraged to keep his wits about him, to see what is to be seen, and hear what is to be heard, and otherwise by employing all of his senses, to be alert to the attendant circumstances. *See State v. LaPierre*, 71 Wn.2d 385, 428 P.2d 579 (1967).

And when the circumstances call for an express refusal or denial of entry in order to make it reasonably clear that the accused intends to deny entry to his house, a police officer needs no warrant if he is in the house with the express or implied invitation of the accused, or with his acquiescence, tacit or express.

The police investigator to whom defendant handed the brown paper bag containing the amphetamines, was a stranger to defendant and unknown as a police agent to Strumski, defendant's confidant. The voluntary delivery of contraband inside the house by a householder to a stranger removed the house and personal effects from the protection of the Fourth Amendment against unreasonable searches and seizures because under such circumstances the acceptance was not unreasonable. That the stranger turned out to be a police investigator would not convert a voluntary delivery into an unlawful seizure. Although defendant did not categorically relinquish his Fourth Amendment protections, his actions show he did not assert them either. Under these circumstances, failure to expressly refuse admittance constituted a waiver of the Fourth Amendment protection.

Defendant thus, in making delivery of the amphetamine in his own house to an undercover agent of the police, brought his transaction within the principles of *State v. Duarte*, 4 Wn. App. 825, 484 P.2d 1156 (1971), where, as the court said, the question arose from the voluntary sale in a face-to-face transaction with an undercover agent who, although a stranger to the defendant, was lawfully present in the seller's house, at least at the latter's implied invitation.

Both the *Duarte* case and *State v. Campbell*, 13 Wn. App. 722, 537 P.2d 1067 (1975), deal explicity with search and seizure and when considered together present a comprehensive analysis of the principles affecting peace officers and their agents, when acting with or without a warrant. *State v. Campbell, supra,* arose from the presence of four police officers in an apartment house, summoned there by a security guard who had reported an altercation in progress. The officers knocked at the defendant's door and were ad-

mitted by him. Inside the apartment were six persons. Upon entering, no illegal activities were seen by the police officers. One of the officers questioned defendant about an outstanding traffic warrant. Defendant denied having received a traffic ticket, adding that he did not drive a car and denied too, that any altercation had occurred in his apartment. During the conversation two of the officers, without permission from any occupant, stationed themselves on the north perimeter of the living room next to a small entranceway to the bedrooms, and 20 to 25 feet from the doorway where the officer had entered defendant's apartment.

One of the officers, from his position on the living room perimeter, near the bedroom door, looked to his right into one of the bedrooms and down at a wastepaper basket resting against the outside of an open door leading into the other bedroom. Inside the basket he saw what appeared to be marijuana. The officer then walked into the bedroom and saw a bag on the bed which contained a number of small objects and on opening this container found inside it a number of baggies. Both containers proved to hold marijuana and constituted the basis for criminal charges. Prior to the seizure of the marijuana, the officers were never asked to leave the premises, nor was anything said to restrict their movements inside the apartment.

The trial court in *Campbell* ordered the seized evidence suppressed, and on appeal this court reversed, holding that police officers, lawfully on the premises, may observe and testify as to anything in plain view. Whether the officers exceeded their constitutional authority, when after being admitted to the apartment they stationed themselves at the perimeter of the living room without further invitation or permission, is determined by what may be described as the reasonable conduct rule, a rule seen by this court as one developed from constitutionally allowable momentary intrusions, and sustained by *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Pointing out that the State has the burden of showing by "specific and attribut-

able facts" a reasonable basis for the intrusion, we held in *Campbell* that a momentary intrusion into a person's privacy for questioning can be justified on grounds which, standing alone, would not constitute probable cause for an arrest. The standard governing a justification for a momentary intrusion, is an objective one; do the facts warrant a man of reasonable caution to believe that the action taken was appropriate. *Terry v. Ohio, supra.* Whether the movement to the perimeter of the living room, without express invitation, constituted an unreasonable and unlawful intrusion as a matter of law was thus specifically answered in *Campbell* at page 728:

> Neither do we find, nor has Campbell directed us to, anything in the record which would support a conclusion that two of four police officers who were granted entry into an apartment which already contained six adults acted unreasonably in moving to the north wall of the room into which they entered without requesting or receiving specific permission to do so. Thus, the officers' "intrusion" to the point from which the sighting took place was justified.

The other case alluded to earlier, and one of apparent controlling effect here, is *State v. Duarte, supra.* There, defendant voluntarily, in his own home sold and delivered drugs to a stranger who turned out to be a police undercover agent. The police agent's presence at the transaction in defendant's home was characterized by the court as being pursuant to at least the latter's implied invitation. And at pages 832 and 833, the court said, "We are unaware of any case that holds that consent or invitation, even though they exist in fact, will not be recognized unless there be express words to evidence them."

From *Duarte* it is clear that when one invites another into his home, whether friend, acquaintance, or stranger, the Fourth Amendment does not afford protection to the householder against what the friend, acquaintance, or stranger sees or hears there. Quoting directly from *Hoffa v.*

*United States*, 385 U.S. 293, 17 L. Ed. 2d 374, 87 S. Ct. 408 (1966), the court stated at pages 301 and 302:

What the Fourth Amendment protects is the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile. . . .

. . . The petitioner, in a word, was not relying on the security of the hotel room; he was relying upon his misplaced confidence that Partin would not reveal his wrongdoing. . . .

Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.

(Footnotes omitted.)

And, continuing in the *Duarte* case, adds at page 831:

Whether the informer was a friend or stranger was not treated as controlling. . . . However, if a conversation with a friend is admissible upon the theory of misplaced confidence as in *Hoffa v. United States, supra,* then a conversation with a stranger, with respect to whom the invitor is more likely to be on his guard, should likewise be admissible.

Finally, and confirming our *Duarte* ruling, is the statement in *United States v. White*, 401 U.S. 745, 28 L. Ed. 2d 453, 91 S. Ct. 1122 (1971) at 749, that the Fourth Amendment "affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'" *Hoffa v. United States, supra* at 302. No warrant to search and seize is required in the circumstances, nor is it when the government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused. *Lewis v. United States*, 385 U.S. 206, 17 L. Ed. 2d 312, 87 S. Ct. 424 (1966).

If a householder is in a position to communicate his refusal of admittance and circumstances leading to and surrounding his entry without a warrant are such that a police officer can reasonably conclude he is not being refused entry, then no invitation, express or implied, is necessary to

make the officer's entry lawful. A refusal of admittance, express or clearly implied, is essential under such circumstances to make the entry by a police officer without a warrant illegal and in its absence he can be said to enter with the tacit acquiescence of the householder for the householder has failed to place his house and contents under the protection of the Fourth Amendment's protection against unreasonable searches and seizures. When one is under a duty to speak, his failure to speak constitutes a waiver. *State v. Duarte, supra.*

And if the entry is made by friends, acquaintances, strangers, police undercover agents, or informers, with the householder's mistaken belief that they either are willing participants in a criminal transaction, or will otherwise not divulge their observations or report them to the police or others, no claim will be sustained that either their presence in the house or their testimony as to what they observed violate the householder's protection under the Fourth Amendment. Everyone present at the commission of a crime or having testimonial knowledge about it is under a duty not only to report it to the proper authorities, but to give evidence in court when called upon by the processes of law to do so.

Assuming that Sabbot, while in his yard, told the police investigator to wait a moment, and then without further admonition was followed by him across the yard, into the house, and across the room to a place where Sabbot voluntarily handed the police investigator a bag containing contraband amphetamines, the officer's presence in Sabbot's house without a warrant was with Sabbot's tacit acquiescence, and accepting the contraband constituted neither an unlawful search nor seizure under the Fourth Amendment.

Affirmed.

PRICE, J. Pro Tem., concurs.

PETRIE, C.J., concurs in the result.