Jasen, J.
The significant issue on this appeal is whether the extemporaneous admission of an unidentified individual, eli *30 cited by a single question from police officers conducting an on-the-scene investigation of possible criminal activity, is admissible, though the standard preinterrogation warnings were not administered until after the admission had been made.
On June 9, 1974, Long Beach Police Officers Richard Brooks and Daniel Bart were assigned to an early morning tour of duty in a radio patrol car. At approximately 4:30 a.m., the officers drove down the alleyway behind East Park Avenue with their car lights extinguished. They observed several individuals standing on the rear steps leading to the back door of a delicatessen. As the police vehicle approached the steps, the group split up and its members began to run. Officer Brooks, the operator of the patrol car, turned on the headlights. The officers observed the man who had been standing closest to the delicatessen door run down the steps, turn right, and go behind some bushes adjacent to the delicatessen. The police car stopped abreast of the bushes and both officers left the vehicle. Officer Brooks saw the man standing behind the bushes looking at him, and drew his revolver but held it at his side, with the barrel pointing down. His partner, Officer Bart, loosened the clasp on his holster, placed his hand on his weapon but did not draw it. Officer Brooks ordered the man to come out from behind the bushes. When the man emerged, with empty hands held in the air, both officers, with the danger past, fully secured their weapons. The man, subsequently identified as Tyrone Huffman, the defendant, was asked, "What are you dong back here?” Huffman replied, "We were trying to break into that store.” Officer Brooks then told him, "That’s enough, don’t say anything else. Just get in the back of the car.” Before entering the police car, defendant was given the standard four-fold preinterrogation warnings set forth in Miranda v Arizona (384 US 436). This exchange was completed in approximately one minute or less.
After the warnings had been given and defendant placed in the car, the officers asked him what had happened to his companions. Defendant replied, "They are around the corner.” In the meantime, Officer Bart heard a noise emanating in the garage next to the bushes. He entered the garage and found another individual. The officer asked this person what he was doing. In response, the man told the officer that he lived in the house that was attached to the garage. "That’s where I live.” Officer Bart did not pursue the matter further and returned to the patrol car.
*31 As the officers were driving away from the scene, they observed three men crouched behind an automobile on a nearby street. The defendant was asked, "Are those your friends that were involved in breaking in?” Defendant stated that they were. As observed earlier, defendant had already received preinterrogation warnings and was therefore aware of his right to remain silent. All the men were placed in the car and cautioned not to talk to each other during the drive to the police station. The officers arrived at the station at approximately 4:40 a.m. The officers then waited with the defendant for 20 minutes until Detective O’Neill arrived. Aside from a pedigree taken by a desk officer, during this wait the police did not converse at all with the defendant. Defendant was brought to an upstairs interrogation room. After being advised of his rights for a second time, the defendant gave the police an oral statement that was subsequently reduced to writing. In the written statement, defendant admitted that he and four friends had been looking for money and were attempting to break into the delicatessen. The delicatessen management kept a rope under the door for the use of restaurant employees and defendant was attempting to reach under the door, grab the rope and use it to force open the door. Defendant read the statement aloud to the officers, initialed some corrections, and signed the statement.
After a hearing on a motion to suppress defendant’s oral and written admissions, the trial court found "that the mere cursory, threshold-type inquiry made by Officer Brooks to the defendant at the scene, did not constitute interrogation and thus does not fall within the ambit of Miranda. [Miranda v Arizona, 384 US 436, supra.] This premise is also substantiated by the fact that immediately after the defendant’s response, the officer told him to say no more. The court was further persuaded by the brevity of the encounter at the scene, lasting less than a minute.” Upon trial, defendant was convicted by a jury of attempted burglary in the third degree. The Appellate Division unanimously affirmed the judgment of conviction, without opinion. (49 AD2d 1039.) The order of the Appellate Division should be affirmed.
In Miranda v Arizona (384 US 436, supra), the Supreme Court was concerned with the development of procedures which would assure that an individual subject to custodial police interrogation would be accorded the Fifth Amendment privilege against compulsory self incrimination. (384 US, at p *32 439.) The court summarized its holding as requiring that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” By procedural safeguards, the court was referring to the four-fold warnings that have now become so familiar to lawyers, the police and the public. (384 US, at pp 444-445.)
Here, the defendant concedes that the police had the right to stop him pursuant to CPL 140.50 (subd 1). Rather, his "objection is to the coercion of answers to the questions posed with guns drawn.” The contention is that defendant had been deprived of his liberty and that, under Miranda and our decision in People v Shivers (21 NY2d 118), any questioning had to be preceded by warnings. Since the defendant had not been advised of his rights prior to the initial oral admission, it is argued, the admission and all subsequent admissions are inadmissible. (Cf. People v Tanner, 30 NY2d 102.)
Our decisions, in applying Miranda, have consistently recognized the distinction between coercive interrogation and permissible street inquiry. In People v Rodney P. (Anonymous) (21 NY2d 1), police officers approached the defendant in front of his home and asked to speak to him privately. The officers then questioned defendant for approximately three minutes about his conduct that afternoon. We stated that "[t]his kind of questioning is little different from routine police investigation of crimes or suspicious conduct at a person’s home, his place of business or on the street—the kind of questioning which has uniformly been held not to require the Miranda warnings.” (21 NY2d, at pp 10-11.) The fact that the defendant might have been restrained if he had attempted to leave was not considered controlling. The test which we established was whether the defendant "as a reasonable person” would believe that his freedom had been significantly restrained. (21 NY2d, at p. 10.)
In People v Shivers (21 NY2d 118, supra), the defendant and a companion were interrogated at length, without warnings, by a police officer who was holding a drawn gun pointed in their direction. We ruled that "once [an] officer * * * draw[s] *33 his gun, the individual interrogated is actually deprived of his freedom and, under Miranda, he may no longer be questioned without first being warned of his rights, and any statement elicited without such warnings may not be received in evidence, or otherwise used, at a subsequent trial.” (21 NY2d, at p 122.) Our determination was predicated on the extensive interrogation conducted at gunpoint, a significant deprivation of defendant’s freedom. The circumstances of a gunpoint interrogation are such as to "affect substantially the individual’s ’will to resist and compel him to speak where he would not otherwise do so freely.’ ” (21 NY2d, at p 121, quoting People v Rodney P. [Anonymous], 21 NY2d 1, 11, supra, and Hoffa v United States, 385 US 293, 304.)
The critical standard running throughout the subsequent cases is whether the police have engaged in "custodial interrogation”. Whether this standard is present generally presents a mixed question of law and fact. (People v Paulin, 25 NY2d 445, 449.) However, both the elements of police "custody” and police "interrogation” must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda. The fact that there may have been police questioning is not controlling. Custodial admissions are not suppressible unless produced by a process of interrogation designed to elicit statements from the defendant. (People v Cerrato, 24 NY2d 1, 9-10, cert den 397 US 940; see People v R. N., 23 NY2d 963.) Nor is there any constitutional requirement that the police recite interrogation warnings when they direct questions or comments at members of the public or solicit information and assistance. A contrary holding would be impracticable, destructive of stable police-community relationships, and was never intended, by any stretch of the imagination, by Miranda. (Cf. People v De Bour, 40 NY2d 210, 218-219.)
Applying the foregoing principles to this case, we recognize that the defendant was undoubtedly subject to the enforced custody of the police when he stepped out from behind the bushes. Although the officers had reholstered their weapons, a reasonable man would have to conclude thát defendant’s liberty had been significantly restricted. The display of the weapons had caused the defendant to come forward from his hiding place in acquiescence to the authority and force of the officers. The weapons had been injected into the situation and their presence, although reholstered, was a factor which a *34 reasonable person could not lightly ignore. Although the incident did not occur at a police station house, the presence of drawn and reholstered weapons is indicative of a "police-dominated” atmosphere which could affect defendant’s will to resist. (People v Shivers, 21 NY2d 118, supra.) This is not to say that the police action in drawing weapons was unjustified. To the contrary, the police were legitimately on guard against a potential assault from an unknown person fleeing from what appeared to be the scene of criminal activity. Their action was a necessary safety measure. Nevertheless, by drawing their weapons on the defendant and thereby obtaining his acquiescence to their authority, the officers gained custody and control of the defendant.
We conclude, however, that the single question propounded to the defendant by the officer did not constitute a process of interrogation to which Miranda is applicable. The conduct of the defendant was, obviously, highly suspicious behavior and the question—"What are you doing back here?”—was designed to clarify the nature of the situation confronted, rather than to coerce a statement. It is significant that the police officers were not engaged in an after-the-fact investigation at the station house. They had found themselves, quite inadvertently, in the middle of a possible criminal transaction and immediate clarification was necessary before taking drastic action. Of the person coming out from the bushes, it was essential to know what he had been doing, hence the inquiry. This was no time for preinterrogation warnings, or the tender of legal representation. In short, the single question and answer were not a part of an interrogation of a suspect. Instead, they were virtually verbal acts in an ongoing crime event at a crime scene. Shivers, thus, is not controlling since in that case a definite crime had been committed, the criminal events at the crime scene had been concluded and the interrogation took place at a distance from the situs of the crime. Here, it was by no means certain that any crime had occurred, the activity, criminal or not, was ongoing, and the question was asked at the scene. Notably, the same question was put to the resident, near the scene of this activity, who had attracted police attention by making some noise in his garage. The question did not compose an after-the-fact interrogation at which Miranda was aimed. The answer, as it turned out, was incriminating. Nevertheless, it was an extemporaneous statement, elicited in the midst of the crime event and uttered *35 in the knowledge that defendant had been discovered hiding in bushes at 4:30 in the morning. In fact, the answer was broader than the question and its incriminating nature took the officers by surprise. To their credit, the officers recognized that defendant might not be aware of his constitutional rights and immediately cut the defendant off and advised him of his rights.
Although not legally relevant to the primary issue, it is notable that defendant later co-operated with the police in apprehending his companions and provided further information even after he had been informed of his rights. Although the initial extemporaneous incriminating answer was, of course, prompted by the equally extemporaneous and essential question and, thus, the question was the producing cause of the response, we cannot say that, as a matter of law, the self incriminating statement was excludible under the Miranda rules. The absence of any extended questioning and the developing and continuing nature of the criminal activity are significant factors which distinguish this case from Shivers. The subsequent oral and written admissions, each preceded by ample warnings, were also admissible.
There is one further point requiring discussion. Defendant, prior to selection of the trial jury, submitted a written motion challenging the composition of both the Grand Jury that indicted him and the jury panel from which the trial jury was to be selected. This motion, predicated upon Taylor v Louisiana (419 US 522) was based upon the allegation that New York had unconstitutionally excluded women from jury service. While the motion was effective to raise a challenge to the jury panel (CPL 270.10), the motion did not preserve a challenge to the composition of the Grand Jury, an issue previously waived as a result of defendant’s failure to make a timely motion to dismiss the indictment (CPL 210.20, 210.35; Birch v Wilson, 40 NY2d 1078). Moreover, defendant failed to submit any proof that would establish systematic exclusion of women and, hence, his challenge to the jury panel was properly rejected on the merits. (People v Parks, 41 NY2d 36.)
The order of the Appellate Division should be affirmed.
Chief Judge Breitel and Judges Gabrielli, Jones, Wachtler, Fuchsberg and Cooke concur.
*36 Order affirmed.