**UNITED STATES of America**

**v.**

**Francis CURCIO & Gus Curcio.**

**Crim. No. N–82–4.**

United States District Court,
D. Connecticut.

April 2, 1985.

William A. Keefer, John H. Durham, John Voorhees, New Haven, Conn., for U.S. Dept. of Justice.

Jacob D. Zeldes, Zeldes, Needle & Cooper, Bridgeport, Conn., for defendant, Francis Curcio.

Andrew B. Bowman, Westport, Conn., for defendant, Gus Curcio.

## RULING ON MOTION FOR A NEW TRIAL AND OTHER RELIEF

CLARIE, Senior District Judge.

The defendants, Francis Curcio and Gus Curcio, have moved the Court, pursuant to Rule 33, Fed.R.Crim.P., the Fourth, Fifth and Sixth Amendments to the United States Constitution, 18 U.S.C. Ch. 119, the supervisory powers of the Court and the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to vacate their judgment of conviction and order a new trial or to dismiss the indictment. They also seek discovery and inspection information pursuant to a motion filed by defendants' counsel dated May 17, 1984.

The defendants were convicted on December 14, 1983, by a jury, having been charged in a seven-count indictment with criminal conspiracy to make extortionate extensions of credit, together with several additional substantive counts of making specific loans constituting criminal acts of extortionate extensions of credit, in violation of 18 U.S.C. §§ 892 and 2. Francis Curcio was found guilty on Counts 1, 2, 3, and 6 of the indictment and Gus Curcio was found guilty on Counts 1, 2, and 6. Count 7 was dismissed by the Court at the close of the government's case for insufficient evidence, and a not guilty finding was made by the jury on Counts 4 and 5.

While an appeal was pending in the Second Circuit Court of Appeals, the Court ordered the government to disclose to defense counsel that, on December 8, 1983, the Chief Prosecuting Attorney of the Boston Strike Force had participated in an "on the record" ex parte chambers conference with the presiding trial judge, while the trial was still in progress. At that meeting, the government attorney represented that the government, but not the trial attorneys themselves, had received lawful wiretap information indicating that the defendants were in the process of actually conspiring to obstruct the completion of the foregoing trial and to deliberately create a mistrial. Following the government's response to the Court's order, the defendants moved, under Rule 33, Fed.R.Crim.P., that

the case be remanded to the trial court to consider their pending motions requesting a new trial, for other relief, and for ancillary discovery.

A full disclosure was made to defense counsel and after several days of court hearings, at which multiple government agents testified, including all the government prosecutors, together with a full review of relevant material, the Court finds that none of the wiretap materials from either the Connecticut or the New York wiretaps affected or prejudiced, in any manner, the defendants' right to a fair trial, nor did the government's intercepted information deprive the Curcios of due process of law. The defendants' motion for a new trial and other relief is therefore denied.

*Facts*

The history of this case is long and filled with delays and frustrations, some circumstantial and others obviously planned and deliberate, made with the purposeful intention of obstructing the administration of justice. On January 13, 1982, the defendants, Francis Curcio and Gus Curcio, among others, were indicted in the United States District Court for the District of Connecticut. Attorney Jacob D. Zeldes filed an appearance for both defendants. A question was raised by the Court and the prosecutor as to whether one attorney could represent both defendants, when they had potentially conflicting interests under the law and should be represented by separate counsel. This issue went before the Second Circuit Court of Appeals for review twice. Both defendants had agreed to waive any conflicting interest claim that might arise. The District Court found the waiver by Francis Curcio was an intentional waiver, but that it was not a knowing waiver made with adequate understanding. *See* 680 F.2d 881 (2d Cir.1982) and 694 F.2d 14 (2d Cir.1982). After the second appeal, Attorney Andrew Bowman appeared for Gus Curcio and Attorney Zeldes remained as counsel for Francis Curcio.

On December 6, 1982, counsel for the government and the defendants entered into a plea agreement before Daly, J., whereby the defendants both agreed to enter a guilty plea to Count 3 of the indictment. The agreement provided for the acceptance of a guilty plea under the doctrine of *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The recommended sentence by the government prosecutor on the plea agreement provided for a six-year prison sentence under 18 U.S.C. § 4205(b)(2), with the understanding that this recommendation would not bind the Court. The defendants also reserved the specific right to obtain review in the Court of Appeals on the issue of whether 18 U.S.C. §§ 891 and 892(b) were constitutional and whether the pretrial publicity, the charge to the Grand Jury and other alleged improper conduct of the government described in the defendants' memoranda, required the dismissal of the indictment. It was further agreed that the defendants would have the right to remain at liberty on the same bonding pending a ruling on appeal.

After reviewing the probation report at the time of sentencing, Judge Daly imposed a prison sentence of eight years on Gus Curcio and nine years on Francis Curcio. The prosecution had represented that at a trial on the issues, it would be necessary to utilize both the provisions of 18 U.S.C. § 892(b) and the *Pinkerton* doctrine to establish a prima facie case against the defendant Francis Curcio on Count 3. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

The Second Circuit reversed the guilty plea conviction and found that the constitutionality of the statutory issue was not factually ripe for appellate review because an adequate trial record had not been made. *United States v. Curcio,* 712 F.2d 1532 (2d Cir.1983). The District Court thereupon afforded both defendants the right to withdraw their guilty pleas in order to establish an adequate trial record for appellate review.

However, prior to negotiating their guilty plea agreement before Judge Daly, the defendants filed motions for discovery and inspection, pursuant to Rules 6(c), 16 and 17, Fed.R.Crim.P., Rule 4 of the Local Rules of Criminal Procedure, United States District Court (D.Conn.), and the Due Process Clause of the Fifth Amendment to the United States Constitution. They sought, *inter alia*, "any written or recorded statement made by each defendant" and all wiretap information acquired by the government pursuant to Chapter 119 of Title 18. On September 8, 1982, and against on July 26, 1983, the District Court (Daly, C.J.) ordered the production by the government of all recordings of the defendants which were known to exist at that time.

On September 14, 1983, just before the actual trial commenced, the defendants filed their Motion for Search and Disclosure of Electronic, Mechanical or other Surveillance. On September 16, 1983, the government responded:

"Other than [electronic surveillance conducted in 1980], and the consensual tape recordings which have already been disclosed to the defendants, the Government is not aware of any consensual or court-authorized electronic surveillance of Francis Curcio ... [Furthermore,] other than [a conversation recorded in 1980], which the Government will not use in the above-captioned case, and the consensual tape recordings which have already been disclosed to the defendants, the Government is not aware of any consensual or court-authorized electronic surveillance of Gus Curcio ... Moreover, the Government is aware of its continuing obligations under Rule 16, Federal Rules of Criminal Procedure."

The case, originally assigned to the Bridgeport seat of court, was reassigned by Daly, C.J., to the Hartford seat of court (Clarie, J.). On October 4, 1983, a jury was selected and the trial commenced on October 6, 1983. On September 19, 1983, three days after the government had filed its response to the prior electronic surveillance, the government obtained a new wiretap order from Judge Daly for the interception of wire and oral microphonic communications from several premises and telephones in the Bridgeport area. At the time, the targets of the investigation were not only the Curcio brothers, there were other individuals, including Vincent Pollina and Salvatore Basso. (Tr. 816). The locations included a social club known as Oakland Social Club or "Louis Lips" (Tr. 859, and known to be frequented by Francis Curcio, Gus Curcio and Vincent Pollina. These intercepts were referred to in Miscellaneous Case No. NH–600 and similar orders were successively procured on October 21, 1983 and November 21, 1983, in Miscellaneous Cases Nos. NH–609 and NH–613. Between September 19, 1983 and December 20, 1983, while the jury trial in Hartford was ongoing, conversations of the defendants with third persons were overheard, as well as between themselves; and there was one telephone call between Gus Curcio and his brother's counsel, Attorney Zeldes. However, nothing of any significance was intercepted or overheard. They were as meaningful as empty words.

After the jury trial had finally concluded on December 14, 1983, the defendant Francis Curcio was found guilty on Counts 1, 2, 3 and 6, and the defendant, Gus Curcio, was found guilty on Counts 1, 2, and 6. At the time of the conviction, the Court advised the government that all relevant sentencing information must be submitted to the Probation Department to be incorporated into their department records. Prior to the day of sentence, on January 19, 1984, the government forwarded to the Court a statement disclosing the existence of the electronic surveillance, and representing that conversations "involving possible violations of other federal law not directly related to the above captioned matter" were intercepted.

On the day of sentencing, January 23, 1984, the Court specifically stated that for purposes of sentencing it was not considering any of the supplemental information submitted by the government; that the

only information it would consider and rely on for sentencing purposes was the evidence actually heard during the trial and the contents of the Probation Report, which excluded the supplemental information.[1]

The Court imposed an effective 10-year overall committed sentence and imposed committed fines of $20,000 in each case. Counsel's brief complains that both defendants received greater sentences after trial, than that which they had received when they were previously convicted on their guilty plea to one count. It is significant to note that Francis Curcio was convicted after a lengthy trial on four counts, not one; and Gus Curcio was convicted on three counts, not one. In the prior case, Francis Curcio and Gus Curcio had received sentences of 9 and 8 years respectively. However, both had pleaded guilty on only one count without a trial under the Alford doctrine, while at the same time denying their actual guilt. Thus, it is apparent that the circumstances were markedly different. At the trial, each of them had taken the witness stand and denied under oath each of the allegations. The jury found the truth to be otherwise than as testified.

### The Trial

As the trial was approaching completion, Gus Curcio tried to deceive the Court by staging a false heart attack in the jury's presence. The Court promptly excused the jury, the courtroom was cleared, and medical attendants summoned from within and without the building. An ambulance was called from the nearby Hartford Hospital and within a few minutes Gus Curcio was being transported as an emergency patient to the hospital. It was later determined that there was nothing actually the matter with him. It was all planned that way. The trial was suspended and a few days later, at his request, he was transferred to the Bridgeport Hospital which was closer to his home. The Court appointed a doctor to examine him, who found nothing basically wrong with him. However, the attending doctor stated that to be certain, he should have a diagnostic cardiac catheterization performed. Gus Curcio would not consent to having this done at the Bridgeport Hospital and insisted that he would only consent, if it were done by a specialist at the Lahey Clinic, located just outside of Boston. However, the latter hospital facility did not have an opening until sometime in January of 1984. Such a long delay would be likely to require a mistrial. Gus Curcio had planned it that way and if the trial aborted, he never did intent to go through with the process. *See* Defendants' Exhibit 5c, p. 2.

The United States Attorney intervened at the Lahey Clinic and arranged an earlier appointment for November 11, 1983, so that a cardiac catheterization could be promptly performed. The medical report revealed "that Gus Curcio's chest pain syndrome is unlikely due to myocardial ischemia." There was nothing found to be basi-

---

1. Excerpt from Sentencing Proceedings, January 23, 1984:

"THE COURT: The ... Motion by defendant Francis Curcio to Strike the Government's Submission to the Presentence Report .... the Court is going to grant your motion for the purposes of sentencing. I don't need this information for sentencing. I heard the trial for two months, and I know as much about the background as apparently is necessary. However, this would not preclude this use of Governmental submission ... will not preclude the Government submitting that to the Parole Board should they see fit at an appropriate time, and if the Parole Board wants to receive it."

"MR. BOWMAN: That means, your Honor, it wouldn't be part of the presentence report?"

"THE COURT: It will not be part of the Probation Officer's Presentence Report. It may be used by the Government to supplement any facts that they feel are appropriate for a Parole Commission to consider....

....

The court will not use it in the sentencing of these two defendants."

"MR. ZELDES: ... the Government's memorandum or submission, as I called it, will not accompany the presentence reports?"

"THE COURT: It will not be a part of that."

....

"That's the reason for the Court's action on the motion; I think it will contaminate the sentencing procedure, and that is the reason why the Court is precluding it."

cally wrong with him and it was concluded that this 32-year old defendant was healthy and able to continue on to the conclusion of the trial.

Before resuming the trial, each member of the trial jury was questioned separately by the presiding judge in his chambers, to determine what each had observed, or heard of the incident while in the courtroom and after they had been excused and retired to the jury room, so as to determine whether any juror had been prejudiced. At this chambers conference, a stenographic record was kept and all defense counsel, government counsel and the Curcios themselves were personally present. While the Court directly asked the questions of the individual jurors, the questions were generally agreed upon by counsel in advance and counsel was invited to suggest further areas of inquiry. All of the jurors, without exception, indicated that they were not in any way influenced by the incident, which they observed or by any verbal remarks made by anyone during and after the event. The Court found that each juror was unaffected by the experience and that each would continue to remain impartial to both sides and render a fair and just verdict pursuant to their official oath.

On the morning the trial was scheduled to resume, and the jury waiting, the Court was advised that Francis Curcio had been involved in a motor vehicle accident shortly after midnight in Shelton, Connecticut, under suspicious circumstances. The Court learned through his counsel and law enforcement authorities, that while driving a 1975 Cadillac convertible, one of his older vehicles, Francis Curcio was struck broadside by a hit and run truck. The identity of the truck was never obtained and it was represented to the police that it had left the scene of the accident without its driver revealing his identity. However, shortly after the alleged accident, by coincidence, an acquaintance of Francis Curcio from Bridgeport happened upon the scene and Curcio was ultimately removed to the Bridgeport Hospital. The defendant complained of back pains rendering him unable to be present for the continuation of his trial.

The Court appointed a qualified physician to examine the defendant. After extensive X-rays were taken, it was ascertained that there was one minor unexplainable variation in the vertebrae which could have been naturally caused by the patient's own obesity and which condition may have existed over a long period of time, his weight being over 470 pounds; or it could have had its origin in the accident. The doctor suggested, however, that by injecting the area with a solution, an X-ray would then reveal whether the defect was of recent origin or had been existent from natural weight causes over a long period of time. The doctor represented that the substance to be injected and the process itself would be harmless to the patient's health, but Francis Curcio refused to tolerate the procedure.

At this point, the Court ordered his return to Court on the following Tuesday, at which time he appeared in a wheel chair and the trial continued. His presence, and the court's observance of his general appearance and demeanor, indicated that he was able to be present, cooperate with his attorney and defend his rights.

During the trial of the Curcios on December 8, 1983, Jeremiah T. O'Sullivan of Boston, the Chief Attorney for the New England Office of the Organized Crime and Racketeering Section, appeared at the chambers of the undersigned. He represented that he had been in contact with Chief Judge Daly and had explained to him the extraordinary reasons for his request for permission to approach the trial judge by ex parte contact and disclose certain wiretap conversations, so as to alert him to an ongoing conspiracy being planned to deliberately force the Court's granting of a mistrial. He represented that his presence in chambers was with the permission and at the direction of the Chief Judge of the Court, pursuant to the law outlined in *United States v. Phillips*, 664 F.2d 971, 1000–04 (5th Cir.1981). However, his ex parte presence was not made known to the

trial prosecutor or his assistant, both of whom had been kept insulated from the wiretap information relating to the ongoing trial.

## Defendants' Claims

### The Sixth Amendment:

The defendants represent that the wiretaps authorized in Miscellaneous Cases Nos. NH–600, NH–609 and NH–613 continued after the trial commenced, thus violating their Sixth and Fifth Amendment rights because they invaded the Curcios' defense perimeter to ascertain confidential information and might have been harmful to the defendants' rights. They also claim that there was disclosure of intercepted materials to personnel of the Organized Crime and Racketeering Section of the Strike Force of the Department of Justice, which was at the same time in the process of trying Criminal Case No. N–82–4.

### Minimization:

The defendants further claim that during the period between September 19, 1983 and December 20, 1983, while the trial was in progress, the government conducted electronic surveillance and intercepted, *inter alia*, conversations of the defendants in which they allegedly discussed trial strategy, as well as a conversation between Gus Curcio and his attorney during the pending trial, Criminal No. N–82–4.

## Discussion of the Law

The defendants assert that the Chief Strike Force Attorney presented material[2] (DX–5a, DX–5b, DX–5c, DX–5d and DX–5e) on an "ex parte" basis to the Curcios' trial judge on December 8, 1983, which he had no right to disclose, because the government could not demonstrate good cause for its need. It has been established, and the Court so finds, that all of the electronic surveillance material in Cases Nos. NH–600, NH–609 and NH–613 was the fruit of lawful court orders, as specifically set out in the findings of Chief Judge Daly, after

an evidentiary hearing on the issue. (*See* Court Exhibit A).

Title 18 U.S.C. § 2517 provides for the lawful disclosure of such communications under the following circumstance:

"(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

"(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties."

The case of *United States v. Phillips*, 664 F.2d 971, 1003 (5th Cir.1981), demonstrates a parallel circumstance to that complained about here. In that case, the Appellate Court approved of the manner in which the trial court handled the problem.

"Appellants contend that the trial judge was improperly involved in the collateral investigation of the alleged plans to disrupt the trial. We conclude that the judge did not act improperly. The Strike Force attorneys contacted the trial judge in his capacity as the presiding judge in those proceedings and the ex parte revelations made by those attorneys were made for two indisputably proper purposes. First, the information conveyed by the attorneys concerning plans by several defendants to disrupt the proceedings was necessary in order to enable the judge to perform his continuing duty to conduct an orderly trial and to take appropriate measures designed to protect the participants therein."

---

**2.** "DX" denotes defendants' exhibit, and government's exhibits are denominated by "PX".

■ The Curcios claim that when the government carried out the electronic surveillance, the content of the recordings should not have been used or conveyed to the trial judge during the trial or to the government prosecutors participating in that trial, because this was a violation of the defendants' Sixth Amendment rights. The factual evidence disclosed that in order to avoid violating said rights and to avoid sharing that knowledge with trial personnel, the Regional Strike Force attorney (Mr. O'Sullivan from Boston) designated Edwin J. Gale,[3] his Chief Strike Force attorney in the State of Rhode Island, to be the executive in charge and he was directed to come to Bridgeport to supervise the wiretap procedures being carried out, rather than using Attorney Keefer, the Chief Strike Force attorney in Connecticut, who at the time was the trial attorney in the Curcio prosecution. The instructions were that the local prosecutors would be permitted to receive daily memoranda concerning the ongoing criminal investigation, but that all reference to the subject matter of the trial should be censored and deleted from any report transmitted to Attorneys Keefer and Durham, as well as the Case Agent Stewart; and that a solid Chinese wall should be erected around them. By so doing, all intelligence information, which in any way related to the subject matter of the trial, would be kept from them until the case was concluded. This fact is established in Defendants' Exhibits 9 and 10. It is also confirmed by a review of the progress reports which were prepared for submission to the District Court that actually issued the wiretap order. (DX–14, DX–28, DX–29, DX–30, DX–31, DX–32, DX–33, DX–34, DX–35, DX–36 and DX–37).

This same question, the insulation of certain prosecutorial staff members by the use of a "Chinese Wall", was recently decided by the Court of Appeals for the Second Circuit in the case entitled *In The Matter of The Grand Jury Subpoena of Jean Ford v. United States of America*, 756 F.2d 249, 254 (2d Cir.1985), where the court said:

"Such policy considerations do not apply to the United States Attorney's Office, since its attorneys represent only one 'client'. Furthermore, if the disqualification of one government attorney could serve as the predicate for the disqualification of the entire United States Attorney's Office, the administration of justice would be irreparably damaged. Indeed, federal regulations expressly provide for the substitution of another AUSA where an AUSA originally assigned to a case for some reason must recuse himself. 28 C.F.R. § 0.131 (1984). We also have recognized the propriety of screening procedures that insulate a former government attorney from particular matters being handled by the law firm which employs him where the former government attorney must disqualify himself.... while possibilities for abuse do exist, we emphasize that it will be the government's burden to show that any investigation or prosecution ... has not been tainted...."

The aforesaid principle is further supported in *United States.v. Sapere*, 531 F.2d 63, 66 (2d Cir.1976).

Prior to the controversial December 8, 1983 ex parte disclosure of the five transcripts to the trial judge,[4] supervising Attorney Gale had received information from Supervising Agent Connaughton that the defendants and their associates had been overheard on November 4, 1983, discussing their prior attempt to sabotage the trial for

---

**3.** By date of October 10, 1983, Attorney Gale acknowledged to Attorney O'Sullivan that he had taken over the supervision of the electronic surveillance; that he withheld this knowledge from the trial attorneys, as directed, that an interception of the Curcios not be disclosed to them because of possible Sixth Amendment issues. He also notified FBI Special Agent-in-Charge Lacey, of the need to isolate the trial team, both agents and attorneys, from any knowledge of interceptions which arguably either related to the ongoing trial or otherwise gave rise to a Sixth Amendment concern. (DX–2).

**4.** *See* Defendants' Exhibits 5, 6a, 6b, 6c, 6d, 6e, and 6f.

the purpose of deliberately creating a mistrial. Actually, all of the intercepted information related to what had occurred in the past and not what was being planned in the future. Apparently, for that reason, Judge Daly, supervising the electronic wiretap, considered and approved an ex parte motion of Strike Force Attorney Gale, who represented that judicial wisdom required the entry of a protective order of nondisclosure. The Court approved that application, thus ordering him not to disclose the taped-transcripts to the trial judge. (DX–18). None of the protected conversation related to the merits of the criminal charge for which the defendants were on trial. (DX–10 and DX–9).

On December 7, 1983, the day preceding the ex parte disclosure, a wire and oral interception arising out of an ongoing investigation in New York City, pursuant to an interception order of Judge Robert W. Sweet in the Southern District of New York, revealed that there was in the making a new planned effort by the Curcios to use medication or pills likely to cause the user to vomit in the courtroom and generally disrupt the trial. (DX–5a). In addition, the medication could cause realistic symptoms of a heart attack so as to indicate a marked fluctuation in rise or fall of the subject's blood pressure. Whereas, the previously intercepted information related only to past courtroom action and did not require that the intercepted information be disclosed, here there was a newly planned action designed to disrupt the courtroom and to deliberately cause the obstruction of justice by forcing a mistrial. A mistrial was something the Curcios apparently wanted very badly.

The Boston Strike Force Attorney O'Sullivan then decided that it was time for him to act. While he could not have prevented the previous incident, since it had already happened, he could take steps to prevent a recurrence and permit a planned criminal conspiracy to succeed. He presented this relevant information to Chief Judge Daly. Attorney O'Sullivan also discussed the legal appropriateness of his conduct with the Chief of the Justice Department's appellate section in Washington, Attorney William C. Bryson, who later became Chief Counsel of the Organized Crime Section. All of those with whom he consulted agreed that the agent was under an obligation to promptly report the newly acquired information to the trial judge. In fact, Judge Daly directed that he should do just that. (Tr. 183).

When Attorney O'Sullivan appeared in the trial judge's chambers, a verbatim transcript was made of that meeting by the court reporter. (DX–5). The Chief Attorney presented a transcript of the New York wiretap of the previous day, December 7, 1983, at 1289 Edison Avenue, Second Floor L, Bronx, New York, (DX–5a); the Connecticut transcripts for November 28, 1983 (DX–5b); November 4, 1983 (DX–5c); October 29, 1983 (DX–5d); and October 10, 1983 (DX–5e).

The substance of the New York intercept stated as follows:

"a conversation between Mr. Pollina and Mr. Ardito; Mr. Pollina being a resident of southern Connecticut, the Bridgeport area, and a close associate of the two defendants on trial in the current case before your Honor, that is, Gus and Francis Curcio.

"In the course of this intercept last evening Mr. Pollina and Mr. Ardito discussed the fact that Mr. Pollina—I'm sorry, Mr. Ardito—was giving to Mr. Pollina various drugs, pills, which based on our understanding of the conversation would cause one or both of the Curcios to have a fake heart attack; and that further that he was advising Mr. Pollina to give these drugs to the Curcios this evening, that is tonight, in Bridgeport.

"In addition, Mr. Ardito discussed with Mr. Pollina one or both of the Curcios taking a medication which he was advising them to take which when they went to court and took water, after having taken this medication, would immediately cause them to vomit.

"The sum and substance of this particular course of medication would be to

hopefully cause a mistrial in this particular matter at this point in time."

While the content of the New York "tape" conclusively established a conspiracy to obstruct justice in the Curcios' trial in Connecticut, (*see* DX–5a), it can be best understood, when interpreted in light of what had already been done to obstruct the trial in the past, as evidenced by Defendants Exhibits 5b, 5c, 5d and 5e. It simply confirmed the defendants' ongoing plan to obstruct justice in the immediate future. The trial judge was entitled to be made aware of this plot so that the mistrial could be averted.[5]

■ The defendants' counsel insist that there was an ongoing order issued by Judge Daly on September 8, 1982 and again on July 26, 1983, that the government should produce all electronic transcripts; and renewed such a motion again on September 14, 1983, before the trial actually commenced.

The Court's prior disclosure order related to intercepted information which the government already had in its possession and planned to use as evidence at the trial. The new electronic information with which we are concerned had been purposefully insulated from the trial prosecutors by appointing the Rhode Island Strike Force Attorney Edwin Gale to supervise the project. Had the government been obligated to reveal the content from the nine locations of surveillance in Connecticut, the whole project would have been futile. The relationship of the Connecticut surveillance project actually tied into certain New York crime families; and to alert one, would destroy the effectiveness of all. In this case, it is important to emphasize that none of the intercepted conversations revealed any trial strategy.

In *Weatherford v. Bursey*, 429 U.S. 545, 555–6, 97 S.Ct. 837, 843–44, 51 L.Ed.2d 30 (1977), where a similar issue was raised, the Court clearly spelled out the criteria that might jeopardize a defendant's Sixth

Amendment rights. It teaches that where the information possessed is developed as a result of penetrating the defense perimeter by electronic surveillance, provided it remained uncommunicated, it posed no threat to a defendant's Sixth Amendment right.

"None of the State's evidence was obtained as a consequence of Weatherford's participation in those meetings. Nevertheless, it might be argued that Weatherford, a dutiful agent, surely communicated to the prosecutors Bursey's defense plans and strategy and his attorney's efforts to prepare for trial, all of which was inherently detrimental to Bursey, unfairly advantaged the prosecution, and threatened to subvert the adversary system of criminal justice.

"The argument founders on the District Court's express finding that Weatherford communicated nothing at all to his superiors or to the prosecution about Bursey's trial plans or about the upcoming trial.... If the fact was, as found by the District Court, that Weatherford communicated nothing about the two meetings to anyone else, we are quite unconvinced that a constitutional claim under the Sixth and Fourteenth Amendment was made out."

Nothing materially relevant or prejudicial to the defendants' trial was revealed to anyone outside of the "Chinese Wall", including the prosecutorial counsel and FBI agents handling the Curcio case. The government's purpose was not to learn what it could about the defendants' defense plans. On the contrary, the Special Agent in Charge Lacey and supervising Agent Connaughton were specifically instructed on October 4, 1983, by Attorney Gale per Defendants' Exhibit 8, as follows:

"The purpose of this memorandum is to again remind all of those who are in any way associated with the conduct of this electronic surveillance that Strike Force Attorneys Keefer and Durham, as well as all agents associated with the

---

**5.** *See* Transcript of Proceedings in Chambers on December 8, 1983 at 2:15 P.M., Defendants' Ex- hibit 5.

trial team in the case of '*United States v. Curcio*, et al,' be insulated from the type of conversation which was intercepted on October 10, 1983. I cannot overemphasize the critical importance of insuring that no member of the trial team is exposed to such interceptions. An error in this area would not only be embarrassing and unprofessional, but could lead to the dismissal of all charges contained in the indictment as well as other sanctions against the Government.

"... I am requesting that SA Connaughton have each agent who is in any way participating in subject electronic surveillance to reread Special Attorney Keefer's letter dated September 18, 1983 and initial it, signifying that he or she has reread the letter."

*Minimization*

The defendants claim that the electronic surveillance which occurred on and after September 19, 1983, pursuant to an order issued by Judge Daly, failed to be monitored in accordance with the minimization requirements of federal law. Title 18 U.S.C. § 2518(5) relating to wire interceptions, provides in relevant part:

"Every order and extension thereof ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interceptions under this chapter...."

■ There was an incident on October 15, 1983, at 3:10 P.M., which the defendants claim to be an illegal intercept of a telephone conversation between Gus Curcio and his brother's attorney, Jacob Zeldes.[6] On December 18, 1984, after a full hearing on the issue of minimization, Judge Daly, the intercept Judge, found:

"The Court credits the testimony of Special Agent Steiger and concludes, substantially for the reasons stated in the government's response, that the interception of the October 15th, 1983, call to the offices of Zeldes, Needle & Cooper was reasonable and did not violate the minimization provision of 18 U.S.C. § 2518(5)."

The Court finds that Judge Daly's "findings" became the rule for this case on the issue of minimization.

■ As to the Sixth Amendment issue, it should be noted that on January 19, 1984, at 1:35 P.M., Attorney Keefer filed an affidavit with the Court, (DX–7), in which he represents:

"Your affiant, aware of the potential legal issues involved in the interception of conversations by criminal defendants, issued the following specific instructions on September 18, 1983 to the agents supervising and conducting the electronic surveillance:

"Additional precautions shall be required with regard to the conversations of Gus and Francis Curcio, both of whom are under federal indictment. Gus Curcio also has pending state charges, including murder conspiracy. While no conversations are likely to be recorded between the Curcios and their attorneys over the target facilities, it is possible that the Curcios may be intercepted discussing their guilt in the indicted cases, and possible defenses. Such conversations by Francis or Gus Curcio should be minimized, as the As-

---

6. The relevant conversation opened as follows:
   "Unidentified
   Male: Good afternoon, Zeldes, Needle & Cooper.
   "Gus Curcio: Yeah, is Jack there?
   There was an inconsequential and unmeaningful exchange followed by the following:
   "Zeldes: Did Frannie tell you to come in tomorrow at one?
   "Curcio: Yep.
   "Zeldes: Okay, bring you, anyway we can get stuff on Acabbo's loans, ya know.

....
   "Curcio: I got a chart for you that's gonna, well, me and you are gonna go over it.
   "Zeldes: For Acabbo?
   "Curcio: Oh yeah, I got one hell of a chart for you.
   "Zeldes: Okay, because, you know, that's why I kept going yesterday, it was crucial that we have that time.
   "Curcio: We got, ah, its gonna be a nice little chart for the jury, there's gonna be some [conversation minimized] (DX–6c).

sistant Attorney General's memorandum of authorization makes clear:

. . . .

"Accordingly, since both Mr. Keefer and Mr. Durham will be trying the pending federal cases, if such conversations are intercepted their contents are not to be communicated in any fashion to Mr. Keefer or Mr. Durham. In such a case, the following procedure should be used:

    1. A summary of the intercepted conversation should be made on a separate monitoring log, which is not disclosed to Mr. Keefer or Mr. Durham;

    2. No daily report of the conversation should be made or disclosed to Mr. Keefer or Mr. Durham;

    3. Jeremiah O'Sullivan, Chief of the Boston Strike Force, should be notified of the interceptions at FTS telephone number 223–3390;

    4. If Mr. O'Sullivan decides that the supervising judge should be informed of the interception, such a report will be presented by a Special Agent of the FBI or by another Attorney of the Department of Justice.

"Despite the above precautions, it should be noted that conversations by Gus Curcio, Francis Curcio or anyone else about pending state or federal charges which constitute or relate to obstruction of justice, subornation of perjury or other offenses *should* be intercepted and the appropriate investigative steps should be taken. The above procedure should also be used in such a case." *See* Tr. 351, 376; *also see* DX–6a.

On October 8, 1983, at 11:24 A.M., a conversation between Gus Curcio and John Vitio was intercepted. (DX–6a). They discussed the progress of the ongoing trial.

Gus observed that in his opinion it was a losing day, while Vitio said that the newspapers made it sound like a winner. Again on October 10, 1983, at 12:44 P.M., a conversation was overheard between Gus Curcio, Francis Curcio and Pollina. They discussed the newspaper account of the trial citing Attorney Zeldes bringing out that the witnesses were paid $109,000 by the government for fees and living expenses. They quoted their attorney as representing "In a few more days they might, they might have to dismiss this case". Gus Curcio also observed, "We want to change it to a charge, misdemeanor, give us more than they promised. One to three years. Change it to a charge, and we'll take it. They won't change it".

The defendants claim these conversations were privileged and that failure to cut off any discussions with their friends about the trial constituted a violation of the statutory minimization requirements. The government, on the other hand, argued that nothing significant in trial strategy was disclosed that could not have been observed and reported in the courtroom by a cub-reporter.

Pursuant to *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the government followed up its burden of persuasion and placed each of the FBI agents[7] on the witness stand for examination, as well as the government attorneys[8] who played a major part in this electronic surveillance. It proved to the Court's satisfaction that minimization was achieved through the testimony of these agents and attorneys, who related in detail how the monitoring ceased as soon as they could determine that the call was non-pertinent and how they took every reasonable

---

7. FBI agents who testified:
John F. Connaughton, Case Agent (Tr. 670).
Kenneth E. Steiger (New York City) Wiretap Monitoring Agent (Tr. 604).
David Cotton, Monitoring Agent (Tr. 753).
Richard T. Roberts, Monitoring Agent (Tr. 774).
Robert B. Stewart (New York City) Monitoring Agent (Tr. 787).

8. Government attorneys who testified:

Jeremiah O'Sullivan, Boston Regional Attorney for Strike Force (Tr. 133–359).
Edwin J. Gale, Rhode Island Chief of Strike Force (Tr. 365–552).
William A. Keefer, Connecticut Chief of Strike Force (Tr. 811–885).
John Durham, Attorney for Connecticut Strike Force.
Alan Nevas, United States District Attorney for the District of Connecticut (Tr. 913, 919).

precaution to refrain from monitoring privileged communications. They also showed that the wiretap evidence was not communicated to government trial counsel when any material pertained to the ongoing trial.

It must be kept in mind that there were nine different wiretaps going on at the same time in this case. The name of Zeldes, as Francis Curcio's attorney, was posted on the wall where the monitoring occurred, so that the monitoring agents could especially avoid any client-attorney interception. Agent Steiger of New York City testified that when the full name of the firm of Zeldes, Needle & Cooper was picked up, in the first instance, he did not know that it was a law firm in Bridgeport and he missed hearing the name Zeldes. (Tr. 610–20).

■ A careful reading of the aforesaid conversation between the defendant Gus Curcio and Attorney Zeldes disclosed no trial strategy that could have been harmful. Subsequent to this incident, and during the trial, a table of interest rates was introduced into evidence by the defendants to demonstrate that the profits from the illegal "loan shark" operation produced such exorbitant profits that the Curcios could well afford to lose a great many loans by non-payment and still make a substantial profit. This proof was intended to demonstrate that there was no need to threaten any debtor with bodily harm to accomplish their enforcement purposes. Nothing overheard on this intercept could have, or did, affect in any manner the planned effectiveness of the trial evidence; nor did it disclose in advance to the government that anyone would seriously raise that argument in a loan shark trial. None of the conversations afforded any strategic benefit to the government's case. It could not be said to be the fruit of a Sixth Amendment violation. See Hoffa v. United States, 385 U.S. 293, 308, 87 S.Ct. 408, 416, 17 L.Ed.2d 374 (1966).

## Plea Negotiations

■ Defense counsel argued that several of the intercepted conversations included communications to third parties evaluating the defendants' chances of being found guilty. (DX–6a, DX–6b, DX–6e, DX–6f, DX–5e and DX–5c). In at least one instance, Francis Curcio quoted his Attorney Zeldes as giving a negative opinion of the defendants' chances of success. They claimed that this intercepted information in the possession of the government counsel or its agents, precluded the defendants from being able to negotiate terms for a more favorable disposition of their case. The evidence disclosed that once the trial had gotten underway on October 6, 1983, the government was no longer seriously interested in negotiating any agreed disposition of the case for anything less than a plea of guilty to a conspiracy under 18 U.S.C. § 371, (Tr. 885–890); and it so advised both defense counsel. (Tr. 916; 931–34). A plea agreement is a grace afforded by the prosecution. It is not a matter of constitutional right.

## Increased Sentence

■ The defendants represent that any sentence greater than that originally imposed violates the rule set out in *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). They claim that there is no objective information concerning identifiable conduct on the part of the defendants that occurred after the original sentencing before Judge Daly, which would justify this Court's application of a greater sentence; and that *Pearce* forbids increasing that punishment if it is simply based upon the fact that the new sentence is imposed by a different judge. It cannot be said that this was a second trial because there never was a first trial.

At the time of the original conviction, both defendants entered an *Alford* guilty plea to only the third count of the indictment; there was no trial. Although the prosecutor, under a plea agreement at the time, recommended a specific sentence of six years' imprisonment under 18 U.S.C. § 4205(b)(2), Francis Curcio received a 9-year sentence and Gus Curcio 8 years. No monetary penalty was imposed. After a

full jury trial, the defendant Francis Curcio was found guilty on four counts, 1, 2, 3 and 6 of the indictment, for which he could have received consecutive sentences of 20 years and pay a fine of $10,000 on each count. The defendant, Gus Curcio, was found guilty on Counts 1, 2 and 6. Thus, after trial each was found guilty on multiple counts; not one count as set out in the original plea agreement.

Another factor to be noted is that each of the defendants took the witness stand and under oath denied their guilt on factual matters, contrary to the testimony of the government witnesses. It is apparent that the jury did not believe the defendants' testimony and found both of them guilty. The jury and the Court had the opportunity to observe and assess the evidence offered by each defendant on the witness stand, evaluate his credibility, as well as the type and quality of evidence testified to by the defense witnesses. The trial lasted from October 4, 1983 to December 14, 1983.

"We hold, therefore, that neither the double jeopardy provision nor the Equal Protection Clause imposes an absolute bar to a more severe sentence upon conviction. A trial judge is not constitutionally precluded, in orther words, from imposing a new sentence, whether greater or less than the original sentence, in the light of events subsequent to the first trial that may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' *Williams v. New York*, 337 U.S. 241, 245 [69 S.Ct. 1079, 1082, 93 L.Ed. 1337 (1949)]. Such information may come to the judge's attention from evidence adduced at the second trial itself, from a new presentence investigation, from the defendant's prison record, or possibly from other sources. The freedom of a sentencing judge to consider the defendant's conduct subsequent to the first conviction in imposing a new sentence is no more than consonant with the principle, fully approved in *Williams v. New York, supra,* that a State may adopt the 'prevalent modern philosophy of penology that the punishment should fit the offender and not merely the crime.'" *North Carolina v. Pearce*, 395 U.S. 711, 723, 89 S.Ct. 2072, 2079, 23 L.Ed.2d 656 (1969).

Finally, it must be stated that during the trial the sentencing court had many opportunities to observe the conduct of both defendants and their persistent efforts to cause a mistrial. The aggressive acts of both defendants, during the fake heart attack of Gus Curcio alone, would justify the Court's increasing the prison term; and the defendants' deliberate delay of the trial and increased expense to the government clearly warranted a monetary assessment in both cases. Both defendants received a fair trial and a just sentence.

The defendants' motion for a new trial or a dismissal is denied in all respects.

SO ORDERED.