OPINION OF THE COURT
Richard C. Failla, J.
In the early morning hours of January 4, 1989, John Breitenbruck was the victim of a gunpoint robbery while on duty as a taxicab driver. According to the statements of the defendant Caviano, he and two other young men hailed Mr. Breitenbruck’s cab and asked to be taken to 80 North Moore Street in lower Manhattan. Upon their arrival at this destination, all three men displayed pistols and announced a stickup. After stealing Mr. Breitenbruck’s money, the three robbers fled to a waiting car and then to nearby Greenwich Street.
Caviano’s statements further recount that in the early morning hours of January 5, 1989, Wellington Yick-Yee, also a taxicab driver, picked up the defendant and two others in the vicinity of Canal Street and Broadway in Manhattan. At their direction, Mr. Yick-Yee took the men to West Thames Street and South End Avenue, a desolate area near new construction in Battery Park City. There, Wellington Yick-Yee also became a victim of a gunpoint robbery. This time, however, after displaying their pistols and announcing a stickup, one of the men went to the driver’s door. When the driver failed to sit still, the man fired a single shot from his .25 caliber automatic weapon, fatally striking Mr. Yick-Yee in the head.
Almost one year later, on December 3, 1989, the defendant, Sean Caviano, was arrested on a naval base outside of Chicago, Illinois. Thereafter, the defendant was extradicted to New York where he was ultimately indicted for the crimes of murder in the second degree (Penal Law § 125.25), robbery in the first degree (Penal Law § 160.15), and robbery in the second degree (Penal Law § 160.10). He has now moved this court for an order suppressing his statements.
On June 21, 1990, June 22, 1990, June 26, 1990, and June 28, 1990, this court conducted a Dunaway-Huntley hearing. The statements in issue were made on December 2, 1989, and December 3, 1989, at the Great Lakes Naval Training Center in Illinois. Detective Michael Clark, Detective Ernest Bugge, Chief Petty Officer Russell Drummond, and Special Agent John Andrew Hogan testified for the People. The defense called Vilma Rose; Denise Caviano Kostoglian, the defendant’s *428 mother; and the defendant as witnesses. Both parties then presented oral and written arguments after consideration of which the court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
The court finds all of the witnesses, except the defendant, to be truthful and fully credits their testimony. The court credits much of the defendant’s testimony, including that he was not under any duress when he gave the statements and that the details he gave about the robberies and the murder are correct to the best of his recollection. These findings are based on this court’s observations of the witnesses while they testified; their demeanor as they testified; the manner in which they responded to questions; and the consistency with which each witness testified, both internally and in relation to others.
Most of the events leading up to the defendant’s arrest are undisputed. On December 1, 1989, Detective Michael Clark, a 22-year veteran of the New York City Police Department, the last five of which he has served on the Manhattan South Task Force, responded to the First Precinct to assist detectives there in the investigation into the January 5, 1989, homicide-robbery of Wellington Yick-Yee. Information from Rajendra Paltoo, who has also been indicted for the robbery of January 4, 1989, and the robbery-homicide of January 5, 1989, implicated the defendant as a participant in both the homicide-robbery and the armed robbery. Nareish Paltoo, Rajendra Paltoo’s brother, who is not alleged to be a participant in either of these crimes, provided additional information that implicated Caviano in the commission of the crimes. Based on this information, the detectives believed that they had probable cause to arrest the defendant and this court so finds.
Hoping to locate Caviano, Detective Ernest Bugge, also of the Manhattan South Homicide Task Force, his partner and his sergeant went to the home of the defendant’s mother and stepfather in Manhattan at approximately 10:00 p.m. on December 1, 1989. The family’s babysitter for the past four years, Vilma Rose, answered the door. She identified herself and stated that the defendant’s mother and stepfather were out for the evening. One of the officers displayed a gold shield, identified the group as police officers, and inquired about the defendant. Ms. Rose stated that the defendant had joined the *429 Navy some months ago and that she thought he was stationed in San Francisco. The defendant’s five-year-old stepsister appeared at the door at this time and said that the defendant was stationed in Chicago.
On the following morning, from his office within the Thirteenth Precinct, Detective Bugge telephoned the Great Lakes Naval Station and requested to speak with the duty agent. Special Agent John Andrew Hogan of the Naval Investigative Service (NIS) returned Detective Bugge’s call at approximately 9:45 a.m. on December 2, 1989. Special Agent Hogan is a counterintelligence agent whose work involves security-related investigations, espionage, and criminal investigations. As a civilian employee of the Navy, Hogan does not have a rank.
Detective Bugge informed Hogan that he was working on a homicide and that a suspect, the defendant, Sean Caviano, may be on the base. Mr. Hogan then contacted Ensign Lyman, the command duty officer (CDO), who confirmed that the defendant was a member of the training center and presently on the basé attending classes. Hogan recontacted Detective Bugge between 11:00 a.m. and noon, and advised him that the defendant was on the base. Detective Bugge responded by stating that he and Detective Clark would like to come to the base and speak to the defendant, if the defendant was willing to talk to them. At approximately 3:00 p.m., on December 2, 1989, Detective Bugge again telephoned Mr. Hogan to confirm that he and Detective Clark would be out later that evening. Bugge also asked Agent Hogan not to take any action in relation to the defendant.
The two detectives arrived, without an arrest warrant, at the Naval Station sometime after 10:00 p.m. central standard time on December 2, 1989. Special Agent Hogan met the detectives at the reception area and escorted them to the NIS office. Pursuant to Navy procedure, Ensign Lyman was notified and he also went to the NIS office.
Shortly after 10:00 p.m., the defendant was interrupted in class and instructed to take his belongings and step outside the classroom where the Duty Master at Arms/Chief Petty Officer Russell Drummond and Petty Officer Cox were waiting. Master at Arms/Chief Petty Officer Drummond, whose responsibilities include enforcing discipline and good order, told the defendant that the CDO wanted to talk to him. Chief Petty Officer Drummond, who wears a uniform and a badge, but who does not carry a weapon, is an instructor at the base and *430 assumes the duties of master at arms on a rotating basis. He believed that he was conveying an order to the defendant, although the defendant had the right to refuse that order. Inasmuch as Ensign Lyman had not instructed Drummond to arrest or detain the defendant in any way, the two petty officers simply escorted the defendant to the NIS building. The defendant was not under guard at this time. Neither Drummond nor Cox remained in the NIS building during the defendant’s interview. Prior to the interview, the defendant was asked to sit in the waiting room.
After several minutes, the defendant was led from the waiting room into an interview room where he formally met Mr. Hogan, Ensign Lyman and the two detectives. Immediately prior to the defendant’s entrance, the detectives and Hogan agreed that only the detectives would question the defendant; Ensign Lyman and Mr. Hogan were merely there as witnesses and representatives of the United States Navy insofar as the interview was being conducted on a United States naval base.
The interview room consisted of an area about 15 feet long by 15 feet wide with a desk, chairs and a two-way mirror. All five individuals were seated about the room with the two detectives and the defendant around the desk.
After introductions were made, Detective Clark told the defendant that he wanted to talk to the defendant about an incident in New York, but first, he had to advise the defendant of his Miranda warnings. Detective Clark read, verbatim, to the defendant, each of the standard Miranda warnings from a preprinted card. The defendant verbally acknowledged that he understood each and every one of these rights and he further stated, at this point, that he was willing to speak to the detectives without an attorney being present.
Detective Clark then stated that Special Agent Hogan had some naval business to conduct and Mr. Hogan moved up to the desk and placed the Navy standard rights waiver form in front of the defendant. Initially, Hogan asked the defendant to read the heading on the form and verify that his name and Social Security number were correct. Also at the top of the Navy waiver form was the phrase "suspected of murder.” Mr. Hogan told the defendant that the form was basically a repetition of what Detective Clark stated, but that because they were on a United States naval base, he was obliged to, and did, read the defendant the Navy version of his Miranda *431 rights. At Special Agent Hogan’s request, the defendant signed and dated the document. Ensign Lyman and Special Agent Hogan also signed this document as witnesses.
At this point, Detective Clark commenced the interview by stating that they were there to talk about a crime that occurred in Manhattan in January of 1989, a homicide-robbery. Clark indicated further that they had traveled a long way and he did not want to waste anyone’s time. When Detective Clark asked the defendant if he knew what the detective was talking about, the defendant said, “yes” and began to calmly relate the events of January 4, 1989, and January 5,1989.
The defendant initially narrated the events without interruption. The Navy personnel did not ask any questions and Detective Clark allowed the defendant to complete his statement before making any inquiries. Detective Clark then went over the defendant’s statement with him for specifics concerning times, locations, and other details. Detective Clark took notes as the defendant recounted the facts. The defendant then read Detective Clark’s writing and signed it at 1:10 a.m. on December 3, 1989. Detective Clark and Detective Bugge also signed this document.
Detective Clark then asked the defendant to write out his own statement which he did. The defendant completed this three-page document and signed it at 2:25 a.m. on December 3, 1989. Detective Clark also signed the defendant’s handwritten statement as well as Detective Bugge.
On the back of the last page of the defendant’s statement, Detective Bugge asked the defendant to draw a diagram relating to the homicide-robbery. It depicts such things as where the defendant and his cohorts hailed the cab; the route the cab took; the destination; the location of the shooting; the direction in which they fled; where they met up with Neil Manganaro; and where the defendant threw his gun down a sewer. This too bears the signatures of the defendant, Detective Clark and Detective Bugge. The diagram was completed at 2:30 a.m. after which time no further inquiries about the facts of the case were put to the defendant. Detective Bugge did recall that the defendant inquired whether he was going to be arrested once the diagram was finished and Bugge told him, “yes.”
Upon the completion of the diagram, Detective Clark telephoned Detective James Donohue at the First Precinct in New *432 York. Detective Clark told Detective Donohue that the interview of the defendant was completed and that Detective Donohue should secure a warrant for the defendant’s arrest. Detective Clark acknowledged that although he and Detective Bugge went to Illinois without an arrest warrant, they anticipated seeking an arrest warrant regardless of whether they obtained a statement from the defendant. He further acknowledged that he believed that if he were to have interviewed the defendant with a preexisting arrest warrant, in the absence of counsel, any statement so obtained would be inadmissible in court.
A Judge, sitting in New York, signed an arrest warrant at approximately 3:45 a.m. A facsimile of the warrant was then transmitted to Illinois. At approximately 4:10 a.m., the warrant was given to Ensign Lyman and Mr. Hogan. The defendant was then taken into custody.
Ensign Lyman sent for Chief Petty Officer Drummond and Petty Officer Cox and ordered them to bring the defendant to the brig. Drummond, for the first time, placed the defendant in handcuffs and also placed him in leg irons. Later that day, the defendant, accompanied by Detective Clark, was brought to an Illinois court where he waived extradition. The defendant was then returned to New York.
CONCLUSIONS OF LAW
The defendant urges this court to suppress his written and oral statements due to violations of his Fourth and Sixth Amendment rights under the US Constitution as well as their counterparts under the NY Constitution. The defendant’s argument under the Fourth Amendment involves the interpretation of a Federal statute that no New York court has ever mentioned, the Posse Comitatus Act (18 USC § 1385 [originally enacted as Act of June 18, 1878, ch 263, § 15, 20 US Stat 152]).
This Act, which codifies the historically rooted proscription against the use of military personnel in civilian law enforcement (see, e.g., Wrynn v United States, 200 F Supp 457, 464 [ED NY 1961], quoting Gillars v United States, 182 F2d 962, 972 [DC Cir 1950]), states that "[w]hoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not *433 more than two years, or both.” In short, the defendant contends that the Navy’s[1] action in this case is the type of conduct that this statute specifically contemplates and prohibits, thereby rendering his detention illegal and the statements that flowed therefrom inadmissible. A review of the cases discussing this statute demonstrates that it is a contention without merit.
Essentially, courts must "[l]ook to the nature of the assistance rendered to the civilian authority in each case to determine if the aid rendered may be characterized as military.” (People v Burden, 411 Mich 56, 303 NW2d 444, 446 [1981].) The nature of the Navy’s assistance in the case at bar, under any view, cannot be characterized as military. At most, the Navy played a passive role in civilian law enforcement activities. (See, United States v Red Feather, 392 F Supp 916, 925 [D SD 1975] [Act does not preclude passive involvement of military authorities which indirectly aids civilian law enforcement]; see also, State v Nelson, 298 NC 573, 260 SE2d 629, 639 [1979], cert denied sub nom. Jolly v North Carolina, 446 US 929 [1980].) There is simply no willful use of the military for civilian law enforcement and at least one court, under remarkably similar facts, has already so held. (See, Commonwealth v Shadron, 471 Pa 461, 370 A2d 697 [1977].) Here, as in Shadron, the civilian police were investigating a homicide where the decision was made to interview the defendant, a member of the Armed Services. (471 Pa, at 463-464, 370 A2d, at 698, supra.) The police likewise contacted the defendant’s out-of-State military base to request that the defendant be made available for questioning and the military personnel escorted the civilian authorities to an interrogation room inside the security headquarters where they interviewed the suspect. The defendant was also fully advised both of the offenses of which he was suspected and of his rights in *434 accordance with Miranda v Arizona (384 US 436 [1966]). (471 Pa, at 464, 370 A2d, at 698, supra.) Although the military police were waiting with the defendant in Shadron, there is no evidence that they participated in the interview. Similarly, there is no evidence in the instant case that Special Agent Hogan or Ensign Lyman participated in defendant Caviano’s interview. Unlike the situation in Shadron, the servicemen in the case at bar did not aid or otherwise participate in a search of the defendant’s barracks room which in Shadron revealed a bloodstained knife.
With even fewer overt acts on the part of the Great Lakes Naval Station personnel, this court, like the Shadron court, must conclude that the conduct of the military authorities did not violate any act of Congress. The record amply shows that the military personnel simply extended the normal courtesies that they would be expected to extend to State officials under the circumstances. (See, 471 Pa, at 466, 370 A2d, at 699, supra.) This is particularly true in light of the fact that the defendant was already on a military base, a location where the civilian police could not intrude without permission or assistance. (471 Pa, at 466, 370 A2d, at 699, supra.) This court, like the Shadron court, finds that it would indeed be a "[p]erversion of the purpose of the posse comitatus statute to hold that the * * * [military] is a sanctuary which insulates a suspect from investigation for a state crime.” (471 Pa, at 466, 370 A2d, at 699-700, supra; see also, Harker v State, 663 P2d 932, 937 [Alaska 1983], quoting Note, Illegal Law Enforcement: Aiding Civil Authorities in Violation of the Posse Act, 70 Mil L Rev 83, 104 [1975] [pursuant to 10 USC § 814 (a) " 'a commander may deliver to civil authorities a member of the armed forces accused of an offense under civilian criminal law, ensuring that military reservations do not become havens for those who violate criminal law]’ ”.)
In the alternative, assuming arguendo that the naval authorities’ conduct did violate the Posse Comitatus Act, this court would nevertheless deny suppression. The remedy for a violation of this Act is limited, by its own terms, to criminal penalties, a fine of not more than $10,000, imprisonment for not more than two years, or both. The Act does not provide, as the court in United States v Walden (490 F2d 372, 376 [4th Cir], cert denied 416 US 983, reh denied 417 US 977 [1974], quoting People v Defore, 242 NY 13, 21 [1926, Cardozo, J.]) noted, that the " '[criminal is to go free because the constable has blundered.’ ” Furthermore, this court, like others, does
*435 not find any suggestion that the Posse Comitatus Act was designed to afford further protection to the rights of individuals. Rather, this court agrees that the Act expresses a policy that is for the benefit of the people as a whole, not one that may be fairly characterized as expressly designed to protect the personal rights of individuals as declared in the Fourth Amendment. (E.g., United States v Walden, 490 F2d, supra, at 377; State v Danko, 219 Kan 490, 548 P2d 819, 825 [1976].) The dearth of cases involving the Posse Comitatus Act generally, and in New York particularly, in light of the century-old statute, lends additional support to the conclusion that the extraordinary remedy of exclusion is unnecessary as an added deterrent to the sanctions that the Act itself provides. (See, State v Danko, 548 P2d, at 825, supra.)
In addition, it cannot be said that there was a willful violation, if a violation of the Posse Comitatus Act occurred at all. The actions of all parties were reasonable and under circumstances such as these, where the wrong that the defendant seeks to remedy is a technical statutory violation, our Court of Appeals has held that it will not apply the extraordinary measure of suppression. (E.g., People v Sampson, 73 NY2d 908 [1989] [suppression not required where New York police failed to follow statutory guidelines when they arrested the defendant in Vermont]; People v Junco, 35 NY2d 419 [1974], mod on other grounds 36 NY2d 712, cert denied 421 US 951 [1975] [cited with approval in People v Sampson, 73 NY2d, supra, at 910] [failure of New York authorities to abide by New Jersey’s arraignment and extradition statute did not deprive New York courts of jurisdiction].) Thus, the defendant’s motion to suppress on this ground is denied in its entirety.
The defendant also contends that his statements should be suppressed on the ground that they were the product of a stratagem specifically designed to circumvent his right to counsel: the failure of the detectives to secure an arrest warrant[2] despite the existence of probable cause and despite their intention to secure an arrest warrant and arrest the defendant regardless of whether the defendant agreed to make *436 a statement. The argument ignores the fact that the defendant enjoys no constitutional right to be arrested. (See, e.g., Hoffa v United States, 385 US 293, 309-310 [1966], reh denied 386 US 940 [1967].) As that court so cogently stated: "[t]he police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.” (Supra, at 310.) Indeed, the argument that the Supreme Court rejected in Hoffa as needing no extended discussion (supra, at 309) is identical to that currently being advanced by the defendant here. On a given date, the Government had sufficient grounds to take Hoffa into custody and to charge him with jury tampering. Had the Government done so, it could not have questioned him without observing his Sixth Amendment right to counsel. (Supra, at 310.) Thus, the Hoffa defendant, like defendant Caviano, urged that his statements were inadmissible because the Government "acquired that evidence only by flouting the [defendant’s] Sixth Amendment right to counsel.” (Supra, at 310.) As the Hoffa court concluded so must this court: "Nothing in Massiah [v United States, 377 US 201 (1964)], in Escobedo [v Illinois, 378 US 478 (1964)], or in any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now.” (Supra, at 310, cited with approval in United States v Lovasco, 431 US 783, 792, n 13, reh denied 434 US 881 [1977]; see also, United States v Watson, 423 US 411, 431 [Powell, J., concurring], reh denied 424 US 979 [1976]; People v Middleton, 54 NY2d 474 [1981] [quoted passages cited with approval].)
This court’s decision declining to adopt such a constitutional doctrine finds additional support in People v Robles (72 NY2d 689 [1988]). In Robles, the police linked the defendant to a homicide-robbery through a bloody fingerprint found on a card in the victim’s handbag. Further investigation disclosed that the defendant had an indictment pending against him in New York County, that he was free on bail, and that he was represented by counsel on that charge. Rather than arresting the defendant on the homicide-robbery charges, police detec *437 tives observed the defendant as he made his court appearances. Ultimately, the defendant entered a plea of guilty to the pending indictment and judgment was entered. Upon his release from jail, the police arrested the defendant for the homicide-robbery. Miranda warnings were administered to him and he was questioned, without counsel present, about these offenses whereupon he made oral, written and videotaped confessions.
At a hearing on a motion to suppress these confessions, the detectives confirmed that the decision not to arrest the defendant was prompted in part by the investigators’ knowledge that they could not question the defendant in a custodial setting in the absence of counsel because he was represented by an attorney on the pending charges.[3] (Supra, at 693.) Both the Appellate Division and the Court of Appeals specifically rejected the defendant’s argument that "[t]his deliberate attempt to 'circumvent’ ” the right to counsel was grounds for suppression. (Supra, at 695.) Similarly, this court must reject the defendant’s argument that the detectives alleged deliberate attempt to circumvent the right to counsel is a ground for suppression. The delay in obtaining an arrest warrant is not qualitatively or legally different from the delay in awaiting the disposition of pending charges. (See also, People v Murray, 72 NY2d 689, 695 [1988] [companion case holding that the government’s affirmative act of dismissing a pending case so as to defeat the requirement of counsel during interrogation on a separate and more serious investigation does not violate the defendant’s right to counsel].) In addition, it does not make sense to give this defendant greater rights to counsel just because he has left the State than a similarly situated defendant would have if he were questioned within New York State.
The defendant’s reliance, in this context, on People v Harris (72 NY2d 614 [1988], revd 495 US —, 110 S Ct 1640 [1990]), for the proposition that "the deliberate failure, despite probable cause, to obtain a warrant” renders the police action illegal, is misplaced. Apart from the Supreme Court’s conclusion that there was no constitutional need for suppression, the issue before the Court of Appeals was one of attenuation: "because *438 defendant was illegally arrested in his home, the court [had to] * * * determine, by applying the factors delineated in Brown [v Illinois, 422 US 590 (1975)], whether the statement given in the police station was sufficiently purged of the taint of this Fourth Amendment Payton [v New York, 445 US 573 (1980)] violation” (72 NY2d, supra, at 620). It is in the Court of Appeals discussion of the third prong of the Brown attenuation test, the purpose and flagrancy of the official misconduct, that the passage upon which the defendant relies so heavily, is espoused. It is never advanced as a separate constitutional ground for suppression and the court never so holds.
Additionally, in Harris (supra), the trial court found as a factual matter that the police had probable cause to arrest defendant at the time they entered his apartment; that they went there with the intention of making a warrantless arrest in his home pursuant to departmental policy; and that they entered the defendant’s home without his consent. (Supra, at 617.) The trial court discredited as " 'nonsense’ ”, the claim that the police went there only to investigate. (Supra, at 618, n 1.) These findings, left undisturbed at the appellate level, highlight the other critical distinctions between these two cases.
In the instant case, as noted above, there is no Fourth Amendment violation, let alone a Fourth Amendment Payton violation. Moreover, the detectives never intended to make a warrantless arrest of the defendant, let alone a — flagrantly unconstitutional — warrantless arrest of the defendant from within the sanctity of his home. Indeed, the overriding concern expressed by both the Court of Appeals and the United States Supreme Court was the special solicitude given to the home; after all, " ' "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.” ’ ” (New York v Harris, 495 US, at —, 110 S Ct, at 1643, supra, quoting Payton v New York, 445 US 573, 585 [1980].) In fact, these two courts part ways primarily because the statement at issue was secured in a police station, not in the defendant’s home. (See, New York v Harris, 495 US, at —, 110 S Ct, at 1643, supra.) In short, the Harris case is simply not applicable to the facts of the case at bar. Accordingly, the defendant’s motion to suppress his statements on the ground that the police waited to obtain an arrest warrant until after the statements were made is denied.
*439 For the reasons set forth above, the defendant’s motion to suppress evidence of his written and oral statements is, in all respects, denied.
[Portions of opinion omitted for purposes of publication.]

. The defendant maintains that despite the statute’s reference only to the Army and the Air Force, case law indicates that it applies to the Navy as well. (See, United States v Walden, 490 F2d 372.) It is by no means settled, however, that the Act does apply to the Navy. (See, e.g., State v Short, 113 Wash 458, 775 P2d 458, 459 [1989, en banc] ["We hold the posse comitatus act refers solely to the Army or the Air Force and not to the Navy”]; Schowengerdt v General Dynamics Corp., 823 F2d 1328, 1340 [9th Cir 1987] ["(S)ection 1385 by its express terms is inapplicable to Navy involvement in law enforcement”], citing United States v Roberts, 779 F2d 565, 567 [9th Cir], cert denied 479 US 839 [1986].) Based on the intent underlying the statute, this court finds the reasoning expressed in Walden to be more persuasive and therefore, finds the Act applicable to the Navy. Noteworthy is the fact that the People do not argue to the contrary.

, Insofar as in New York the defendant’s indelible right to counsel attaches upon the commencement of criminal proceedings (see, e.g., People v Blake, 35 NY2d 331, 339 [1974]), and hence, upon the issuance of an arrest warrant (see, CPL 120.20, 1.20 [17]), it is undisputed that any statement obtained from the defendant in the absence of counsel after such warrant is ordered would be inadmissible at trial.

. The manner in which the right to counsel attaches under these circumstances stems from People v Rogers (48 NY2d 167 [1979]). In this context, it is noted that while the Court of Appeals stated that Rogers is still good law, the court did overrule People v Bartolomeo (53 NY2d 225 [1981]), a decision bom of the Rogers case. (See, People v Bing, 76 NY2d 331 [1990].)